Filed 3/27/15  In re E.G. CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re E.G., a Person Coming Under the Juvenile Court Law. | H040886 (Santa Clara County Super. Ct. No. 3-13-JV40390A) |
| THE PEOPLE, Plaintiff and Respondent, v. E.G., Defendant and Appellant. | |

### INTRODUCTION

Appellant E.G. admitted the allegations that he committed an assault by means of force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(4))[1] and grand theft (§§ 484-487, subd. (c)).  The juvenile court declared E.G. a ward of the court and committed him to the county Juvenile Rehabilitation Facilities, Enhanced Ranch Program (the Ranch) for six to eight months, followed by probation.  The court imposed various terms of probation.  E.G. raises several contentions on appeal.  First, E.G. contends that the juvenile court abused its discretion in committing him to the Ranch without further

---

[1] All further statutory references are to the Penal Code, unless otherwise indicated.

investigating other options. E.G. also challenges a no-contact probation condition on the ground that it is unconstitutionally vague. Lastly, E.G. contends, and the Attorney General agrees, that the case should be remanded as the juvenile court did not expressly find whether his grand theft offense was a misdemeanor or a felony. As we will explain below, we find no error in the court's determination to commit E.G. to the Ranch. However, we will reverse and remand the matter for the juvenile court to declare whether the offense is a felony or a misdemeanor, and we will modify the no-contact probation condition.

### STATEMENT OF THE CASE

On November 26, 2013, the district attorney filed a juvenile wardship petition (Petition A) under Welfare and Institutions Code section 602, subdivision (a), alleging that on November 21, 2013, E.G. committed an assault with a deadly weapon (§ 245, subd. (a)(1)). It was further alleged that E.G. personally used a knife (§§ 667, subd. (b) & 1192.7), and inflicted great bodily injury (§§ 12022.7, subd. (a) & 1203, subd. (e)(3)).

On December 19, 2013, the district attorney filed a second juvenile wardship petition (Petition B), alleging that on August 27, 2013, E.G. committed robbery in the second degree (§§ 211-212.5, subd. (c)). On the same date, the district attorney amended Petition A to add count two, a felony assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)) and amended Petition B to add count two, grand theft from a person (§§ 484 & 487, subd. (c)). E.G. admitted count two of each amended petition, and the district attorney dismissed count one of each petition and the special allegations.

On February 24, 2014, after a contested dispositional hearing, the juvenile court declared E.G. a ward of the court and set the maximum period of confinement to four years eight months. The court committed E.G. to the Ranch for six to eight months, which was to be followed by probation. The court imposed several terms and conditions

2

of probation, including a condition prohibiting E.G. to "have no contact of any type with Daniel K., Mitsuwa Market Place."

STATEMENT OF THE FACTS

### A. Petition A

On November 21, 2013, E.G. and the victim got into an altercation in front of the Santa Clara Billiards. The altercation escalated into a fist fight, and E.G. took out a knife. He stabbed the victim several times, resulting in injuries to the abdomen and arm. E.G. then fled from the scene. The victim was hospitalized, required surgery, and was in the Intensive Care Unit (ICU) for two days.

### B. Petition B

On August 27, 2013, E.G., who was with co-participant, D.K., hid two cans of Monster energy drink in his backpack while he was at a Mitsuwa Market Place. E.G. and D.K. attempted to leave the store without paying for the drinks, but the store security guard stopped them. When the security guard grabbed the backpack, E.G. punched the security guard in the face. Both E.G. and D.K. fled the scene.

DISCUSSION

### A. *The Juvenile Court Did Not Err in Committing E.G. to the Ranch*

#### 1. *Relevant Proceedings*

At the change of plea hearing, E.G. asked to be released on the electronic monitoring program (EMP). The court expressed its concern with releasing E.G., specifically pointing to a recent incident where E.G. assaulted a staff member in juvenile hall. The court stated "I am very distressed about that [incident], [E.G.]. Because here you are, in a very highly supervised setting, and you're hitting an authority figure." The court then stated that it needed more information and stated that it would "follow the recommendation of probation today and have [E.G.] stay in custody where I am going to order a psych eval[.] to assist us with the types of services that we can help [E.G.] with issues that we are seeing and in the family as well."

3

On January 2, 2014, the probation department submitted a social study on E.G. The report noted that on November 24, 2013, E.G. was admitted to juvenile hall, where he had since been exhibiting poor behavior. The report specified that he had failed to follow rules, and on December 9, 2013, he received an incident report for assaulting a staff member. The social study also included information regarding E.G.'s background, family issues, education, and risk assessment. E.G. was born and raised in El Salvador. He lived with his grandparents until the age of 15, when his parents sent for him to live with them in the United States. E.G. stated that he had a good relationship with his father and his siblings, but reported that his mother was physically and mentally abusive. He claimed that his mother was an alcoholic. With respect to his educational background, E.G. was enrolled in high school, but had failing grades and had 234 absences. E.G.'s risk of recidivism was measured by the Juvenile Assessment and Intervention System (JAIS). The JAIS revealed that E.G. had general instability in his life. Based on the information from the social study, the probation officer opined that E.G. "is in need of a stable, focused environment where he will be held accountable for his violent criminal behavior, while granting the opportunity to receive the services appropriate to address his needs . . . ."

On January 15, 2014, Dr. Robert Perez submitted a psychological evaluation, which was based on a review of E.G.'s record, an interview with E.G. at juvenile hall, and a phone interview with E.G.'s mother. Dr. Perez administered several tests; the results of which indicated that E.G. had significant intellectual limitations. Dr. Perez also diagnosed E.G. with "adolescent antisocial behavior and adjustment disorder." The doctor deduced from the fact that there was no previous history of "acting out" behavior that the stresses related to immigration had a significant impact on his present behavior. Dr. Perez observed that the "acting out" behavior had been predominantly displayed within the home setting. Additionally, the doctor noted that E.G. had a "very significant level of conflict with his parents (particularly with his mother)." The doctor specifically

4

mentioned E.G.'s frequent arguments with his mother, especially when his parents are intoxicated. Dr. Perez recommended that psychiatric treatment was appropriate. He stated that wraparound services would be required and that "[p]lacement would be most beneficial to the minor." (Emphasis omitted.) He also stated a need for family counseling and sobriety within the home.

On February 10, 2014, the juvenile court began the contested dispositional hearing, but continued it to a later date so that E.G. and his family could be formally assessed for wraparound services. The court explained that it was ordering wraparound service screening because it was the "court's obligation pursuant to the law . . . to explore every single avenue, short of the most restrictive placement, which would be . . . the Ranch . . . unless we go up to [Division of Juvenile Justice]."

Prior to the continuation of the dispositional hearing, the probation department prepared a supplemental report. The report mentioned that E.G.'s case was screened and denied acceptance for wraparound services based on the "severity of the offense and the lack of contributing factors, as well as, the minor's continued defiant and assaultive behavior in Juvenile Hall." The report also stated that he had been "demoted to restructure program again . . . for cumulative disciplines." Based on several factors, including the severity of the offense, E.G.'s accountability, his needs, his psychological evaluation, and public safety, the probation officer stated that E.G. would need a structured environment where he would receive intensive supervision, individual and family counseling, and appropriate educational resources. The probation officer recommended that E.G. be committed to the Ranch. The probation officer also recommended intensive family counseling, victim awareness programs and group counseling, educational programs, and wraparound services following the completion of the Ranch program. Lastly, the probation officer recommended terms and conditions of probation.

5

Additionally, the probation department submitted a memorandum regarding the wraparound services screening. E.G.'s case was screened by the Resource and Intensive Services Committee (RISC), which found E.G. ineligible for wraparound services due to "the nature of his crime, lack of remorse towards the victims, defiance of authority while detained in Juvenile Hall, and a lack for a suitable home environment." RISC recommended that E.G.'s case be referred to San Andreas Regional Center (SARC) for further examination and for him to complete an IQ test. RISC also recommended programs for the parents including Alcoholics Anonymous classes prior to E.G.'s return home. In addition, RISC referred the case to East Field Ming Quong UPLIFT program, which provides services for adolescents with serious emotional disturbances.

On February 24, 2014, the juvenile court resumed the contested dispositional hearing. At the hearing, E.G. raised the issue of the RISC's recommendation that he be referred to SARC and to the UPLIFT program. E.G. argued that as an alternative to the Ranch, the regional services would be able to address his issues. E.G. also claimed that he was doing better in juvenile hall, and he requested that he be released on electronic monitoring.

The juvenile court responded that "the record reflects that [E.G.] hasn't done well in the hall until the last week or so." The court expressed that though it ordered the rules to be provided in Spanish, it nonetheless had concerns with E.G.'s ability to understand the rules. The court noted that it was "not sure how much [E.G.'s] lack of remorse and defiance towards authority . . . is a communications issue and or a function of his cognitive abilities." Additionally, the court mentioned "it appears there is a lack of a suitable home environment to even begin the wrap around services. In fact, he says he qualifies possibly for the intensive wrap services but . . . that resource is not available at this time. But it also recommends that the parents attend the Parent Project and that mother participate in Alcoholics Anonymous before your client can even be returned home."

6

The juvenile court emphasized the seriousness of E.G.'s crimes and his pattern of assaultive behavior: "In this case there was a fight that resulted in three knife wounds. Your client wielded a knife. I think it's certainly disputable whether or not your client initiated the fight, nevertheless, he was using a knife. He injured the victim in the armpit, the right tricep and the abdomen puncturing his kidney, causing internal bleeding and causing the victim to be in I.C.U. for two days and have to have surgery. This was a very serious and violent act. . . . [¶] There was a prior incident where he assaulted a store employee as he was leaving with a theft of two Monster drinks. And then there was more assaultive behavior in the hall. And my fear is that unless the right amount—the right balance of family intervention and services to your client, [E.G.], services to you and your family, I am concerned about public safety." The court followed the recommendation of probation and sentenced E.G. to a minimum of six months at the Ranch. The court concluded that probation "has demonstrated that this is in the minor's best interest and consistent with public safety."

### 2. *Analysis*

"A juvenile court's commitment order may be reversed on appeal only upon a showing the court abused its discretion. [Citation.] ' "We must indulge all reasonable inferences to support the decision of the juvenile court and will not disturb its findings when there is substantial evidence to support them." ' [Citation.]" (*In re Robert H.* (2002) 96 Cal.App.4th 1317, 1329-1330.) According to our Supreme Court in *In re Eddie M.* (2003) 31 Cal.4th 480, 507: "Under [Welfare and Institutions Code] section 202, juvenile proceedings are primarily 'rehabilitative' [citation], and punishment in the form of 'retribution' is disallowed [citation]. Within these bounds, the court has broad discretion to choose probation and/or various forms of custodial confinement in order to hold juveniles accountable for their behavior, and to protect the public. [Citation.]"

At the dispositional hearing, the court is required to "receive in evidence the social study of the minor made by the probation officer" as well as "any other relevant and

7

material evidence that may be offered." (Welf. & Inst. Code, § 706.) Additionally, Welfare and Institutions Code section 725.5 lists several factors to be considered "in addition to other relevant and material evidence, (1) the age of the minor, (2) the circumstances and gravity of the offense committed by the minor, and (3) the minor's previous delinquent history."

E.G. argues that the juvenile court abused its discretion in failing to consider other regional services. Specifically, he contends that the court erred in not following RISC's recommendation that E.G. be referred to SARC or the UPLIFT program. However, even if the regional services would have been a suitable option, the court is not required to follow any particular order in placement from least to most restrictive. "[T]he court [does not] necessarily abuse its discretion by ordering the most restrictive placement before other options have been tried. [Citations.]" (*In re Eddie M., supra,* 31 Cal.4th at p. 507.)

Here, the record shows that the juvenile court considered the psychological evaluation, the social study, and other probation reports in deciding to commit E.G. to the Ranch. The information provided to the court revealed that E.G. was 17 at the time of the assault incident. Although he had no prior offenses, the crimes here were very serious and violent. With respect to the assault offense, E.G. stabbed the victim multiple times, and the victim required surgery and intensive care for two days. As noted by the juvenile court, even if E.G. did not initiate the fight, he nonetheless used a knife. With respect to his theft offense, E.G. also exhibited violent behavior by punching the security guard in the face. The gravity of the offense is a proper consideration at disposition. (*In re Robert H., supra,* 96 Cal.App.4th at p. 1330; see also Welf. & Inst. Code, § 725.5.)

In addition to the violent nature of E.G.'s offenses, the probation report noted that E.G.'s aggressive and antisocial behavior continued in juvenile hall. He continued to break the rules, and in one instance, he assaulted a staff member. E.G. was also demoted in juvenile hall due to his multiple disciplinary issues. Moreover, the social study and the

8

psychological evaluation revealed that E.G. had an unstable home environment, as he had a "very significant level of conflict" with particularly his mother. The reports also indicated that his mother had problems with alcohol. Additionally, the psychological evaluation noted that E.G. had an anti-social disorder and had recent issues with "acting-out" in the home setting. E.G. was also failing in school and had issues with school attendance.

Based on all these facts, the juvenile court appropriately reasoned that commitment to the Ranch would be the best option given the seriousness of the crime, E.G. continued display of aggression and anti-social behavior, the need to ensure community safety, the lack of a suitable home environment, and the services available to E.G. at the Ranch. We thus conclude that on this record, the court properly exercised its discretion in committing E.G. to the Ranch.

## B. *The No-Contact Probation Condition*

Next, E.G. contends that the probation condition requiring that he "have no contact of any type with Daniel K., Mitsuwa Market Place" is unconstitutionally vague and must be modified to include an express knowledge requirement.[2]

"[P]robation conditions may be challenged on the grounds of unconstitutional vagueness and overbreadth." (*People v. Freitas* (2009) 179 Cal.App.4th 747, 750.) We review such constitutional challenges de novo. (*In re Shaun R.* (2010) 188 Cal.App.4th 1129, 1143.)

"A probation condition 'must be sufficiently precise for the probationer to know what is required of him, and for the court to determine whether the condition has been violated,' if it is to withstand a challenge on the ground of vagueness. [Citation.] A

---

[2] The issue of whether a no-contact probation condition must be modified to explicitly include a knowledge requirement is currently pending before our Supreme Court in *In re A.S.* (2014) 227 Cal.App.4th 400 (review granted Sept. 24, 2014, S220280).

probation condition that imposes limitations on a person's constitutional rights must closely tailor those limitations to the purpose of the condition to avoid being invalidated as unconstitutionally overbroad. [Citation.]" (*In re Sheena K.* (2007) 40 Cal.4th 875, 890.) "California appellate courts have found probation conditions to be unconstitutionally vague or overbroad when they do not require the probationer to have knowledge of the prohibited conduct or circumstances." (*People v. Kim* (2011) 193 Cal.App.4th 836, 843.)

In this case, the juvenile court adopted the conditions as recommended by the probation department. The court did not give further explanation, commentary, or instruction on any of the conditions, including the no-contact probation condition. E.G. argues that, absent a knowledge requirement, the no-contact condition is vague because he could inadvertently violate the condition "by accidentally coming into contact with the victim in everyday social situations . . . ."

Although it is unlikely that a probation officer or the juvenile court would deem an accidental encounter with the victim as a violation of the no-contact condition, we will nonetheless modify the condition for the sake of clarity. The condition should now read: "18. That said minor shall not knowingly have contact of any type with Daniel K., Mitsuwa Market Place."

### C. *An Express Declaration of E.G.'s Grand Theft Offense as a Felony or a Misdemeanor is Necessary*

Lastly, E.G. claims that remand is necessary in order for the trial court to make an express declaration about whether his grand theft offense was a felony or a misdemeanor.

Welfare and Institutions Code section 702 provides, in pertinent part: "If the minor is found to have committed an offense which would in the case of an adult be punishable alternatively as a felony or a misdemeanor, the court shall declare the offense to be a misdemeanor or felony." The statute "is unambiguous. It requires an explicit

10

declaration by the juvenile court whether an offense would be a felony or misdemeanor in the case of an adult." (*In re Manzy W.* (1997) 14 Cal.4th 1199, 1204 (*Manzy W.*).) The statute "serves the purpose of ensuring that the juvenile court is aware of, and actually exercises, its discretion under Welfare and Institutions Code section 702. For this reason, it cannot be deemed merely 'directory.' " (*Id.* at p. 1207.) "The key issue is whether the record as a whole establishes that the juvenile court was aware of its discretion to treat the offense as a misdemeanor and to state a misdemeanor-length confinement limit." (*Id.* at p. 1209.)

A juvenile court's failure to make the necessary declaration "requires remand . . . for strict compliance with Welfare and Institutions Code section 702." (*Manzy W., supra,* 14 Cal.4th at p. 1204.) On remand, the maximum period of physical confinement may need to be recalculated based on the juvenile court's express declaration. (See *id.* at p. 1211.)

E.G.'s grand theft offense could have been punishable as either a felony or a misdemeanor. (See §§ 487 & 489; *People v. Douglas* (2000) 79 Cal.App.4th 810, 813-814.) Here, Petition B and the minute orders from the jurisdictional and dispositional hearings stated that the grand theft offense was a felony. However, nothing on the record demonstrates that the court was actually aware of its discretion and exercised that discretion to treat the offense as a felony, rather than a misdemeanor. Therefore, remand is appropriate to allow the court to make an express declaration as to whether the grand theft offense is a felony or a misdemeanor. (See *Manzy W.*, *supra*, 14 Cal.4th at p. 1209.) In the event that the juvenile court elects to treat the offense as a misdemeanor, it shall recalculate the maximum time of confinement accordingly.

## DISPOSITION

The dispositional order is reversed and remanded. The no-contact probation condition shall be modified as follows: "That said minor shall not knowingly have contact of any type with Daniel K., Mitsuwa Market Place." The juvenile court shall

11

make an express declaration of whether the grand theft offense is a felony or a misdeameanor.

_____
RUSHING, P.J.

WE CONCUR:

_____
PREMO, J.

_____
ELIA, J.

12