[No. B152012. Second Dist., Div. Seven. Mar. 21, 2002.]

In re ROBERT H., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
ROBERT H., Defendant and Appellant.

## Counsel

Edward J. Haggerty, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Victoria B. Wilson and Michelle J. Pirozzi, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**LILLIE, P. J.**—Robert H. appeals after the order of wardship (Welf. & Inst. Code, § 602) following his admission in a case settlement that he was a minor illegally in possession of a firearm (Pen. Code, § 12021, subd. (a)(1)) and after an order of disposition for the Camp Community Placement program. He contends: (1) the court abused its discretion by ordering Camp Community Placement in lieu of a disposition of home on probation; (2) the court abused its discretion by ordering conditions of supervision for drug and alcohol testing; and (3) the court failed to make the formal finding

required by Welfare and Institutions Code section 726 for removing the minor from the custody of his parents.

## FACTS

The petition alleged the minor assaulted another person with a firearm within the meaning of Penal Code section 245, subdivision (a)(2). In a case settlement, the People amended the petition to include an allegation the minor committed the felony of being a minor in illegal possession of a firearm. The minor admitted the latter allegation, and the assault charge was dismissed. The court accepted the admission after the minor waived the requisite constitutional rights. The court declared the minor a ward of the court.

The minor was informed that his admission meant the court would make a choice at disposition between home probation and camp. The minor was told he would be sent to the California Youth Authority only in the event he again was in serious trouble.

The court set a date for a contested disposition hearing and ordered an evaluation of the minor by a psychologist.

At disposition, the court read and considered a social study indicating on March 22, 2001, the minor used a nine-millimeter semiautomatic firearm to assault an adult without justification. The minor had no prior contacts with law enforcement. The mother told the probation officer that the minor was well behaved at home and complied with an 8:30 p.m. curfew. The mother denied the minor was involved in gang activities or used illicit drugs. The mother explained that the minor was in an independent school study program due to an inability to adjust to the regular school setting. The mother explained that the parents planned for the minor to return to regular school sessions after special tutoring to attain his grade level. The mother said she was shocked by the minor's arrest. She claimed the minor participated in the shooting in self-defense. The mother wished home supervision in lieu of an order for camp.

The probation officer recommended the Camp Community Placement program and full-time schooling. The probation officer said the offense was extremely serious. It appeared the minor used a firearm in an attempt to settle a dispute with an adult. The misconduct could have resulted in death. Otherwise, the minor was apparently not delinquent or involved with drugs or gangs. It was noted the minor's companion was in possession of marijuana at the time of the arrest. The probation officer was concerned the minor was not being adequately socialized, since he was not attending

full-time sessions at school. After speaking with the mother at length, the probation officer concluded the minor is part of a supportive two-parent household and the minor does not misbehave at home.

The probation officer suggested that in camp the minor could obtain counseling for his anger and aggressive behavior. There was a need to protect the community from the minor. If supervised at home, there was no guarantee the minor would not persist in misconduct. Punishment would impress on the minor his misconduct affected the community, as well as his victim.[1]

The minor submitted to the court a psychological evaluation. The psychologist made her evaluation during an interview of the minor in juvenile hall. The psychologist outlined the facts of the shooting as revealed by the arrest report. She said the victim, Sean Martin (Martin), told deputy sheriffs that the minor and a boy named Jessie met with Martin outside Mike's Liquor Store on Slauson and Fairfax Avenues in Los Angeles. The minor got into an argument with Martin. Moments later, the minor shot at Martin. Martin chased the minor and Jessie by car and on foot until Martin fell in the street. The minor and Jessie fled, and the minor hid a handgun in some ivy. Deputy sheriffs took both the minor and Jessie in custody.

The psychologist reported the minor was a tall boy, age 14. The minor's verbal skills appeared to be below average and his self-esteem was low. His reading skills were well below average. The minor is a special education student with a learning disability. The minor seemed lethargic, pessimistic and had a difficult time speaking for himself. He did not appear angry or to have a thought disorder.

The psychologist reported that the minor is the youngest of five children. His mother has older children from a prior marriage. The minor also has two older sisters, ages 28 and 20, from his mother's current marriage. The father is a Veterans Administration counselor. The mother is a United States District Court bankruptcy analyst. The parents report that the minor has a

---

[1] The probation officer later submitted to the court an updated social study. The probation officer changed his recommendation to home supervision. The probation officer observed that, given the minor was permitted to admit to only a lesser offense than assault, and considering the parents were supportive of the minor, home supervision was adequate. The minor was getting A's and B's in independent study. The probation officer still wanted the minor going to school—at least to the half-day-session continuation program. The probation officer concluded there was still a "high need" to protect the community. If the court chose home supervision, the minor should be advised his conduct would be carefully scrutinized by his supervising probation officer and any violation or new arrest would result in camp placement. The probation officer recommended a violence prevention program and conflict resolution mediation.

learning disability. The parents spend a lot of time with the minor. Because of the minor's height, the parents were leery of holding him back in school and put him in special education classes. The parents explained that the minor functions at a higher level than the special education children, but at a lower level than the other school children. He is shy and is frequently teased by the other children. He has a hard time making friends. His parents enrolled the minor in sports to increase his socialization skills, and the minor has had some success in that area through sports.

The parents reported to the psychologist that the minor was doing well to age 13. At age 13, a teacher was severely critical of his academic skills, and the minor believed her, and he suffered from the criticism. Also, there was a dispute with a neighbor. The neighbor refused to pay the minor for yard work the minor performed. The minor took the debris he had picked up from the neighbor's lawn and dumped it on the lawn. When the neighbor saw what the minor had done, the neighbor pulled the minor off his bicycle and choked him, which traumatized the minor. The incident with the neighbor left the minor feeling vulnerable and disillusioned about fairness. In another incident, this time of mistaken identity, the police arrested the minor. The parents reported this latter incident further affected the minor's sense of fairness and vulnerability.

The psychologist reported that school records support the parents' report of the minor's history. The minor's intellectual skills are average, but his academic skill levels are well below average. He seems discouraged about learning and is too interested in social interaction. He was not described as a behavior problem. The minor was not doing well at Westchester High School. The parents decided to put him in a tutorial situation at Los Angeles City schools to improve his academic skills. The mother was concerned there were youngsters at City of Angels who were "bad influences" and she did not want the minor attending regular sessions and being exposed to such youngsters. The parents' plan was to reenroll the minor in regular session as soon as his academic skills improved.

The minor reports his parents are supportive. The minor is sensitive about his school achievement and insists he can complete his study programs without special tutoring. The psychologist observed that the minor has no career goals and his verbal skills and self-esteem seem wanting.

The psychologist reported the minor explained the offense by telling her that Martin was talking behind his back and calling the minor a "bitch." The minor was aware "bitch" was a slang term in prison; and the term indicated the minor was weak. The minor challenged Martin, and Martin punched the

minor in the head unexpectedly. The minor said, "It was so quick. When I shot he was coming toward me. A bus rolled past and he waited for the bus to pass. I couldn't run from him because he would have told everyone I had run from him." The minor reported that he used a gun since he could not fight Martin all by himself; Martin would have beaten him up. The minor explained that he found the gun and shot to scare Martin. The minor claimed he shot in self-defense. The minor explained if he had waited for Martin to approach him, Martin would have bested him in the fight.

The psychologist explained that the minor was afraid, since Martin was an adult, a larger youth and belligerent. The minor told the psychologist about his experience with the neighbor and said he did not want anyone to do that to him again. The psychologist explained the minor's thinking was as follows: " Because [the minor] was a fairly young boy and had been attacked by an adult neighbor, he felt significantly threatened and also it caused him to feel more watchful and mistrustful of adult men. Because of the way the adults around him responded, he lost the sense that others would protect him and that there was some kind of justice. This caused him to feel like he needed to take things into his own hands. In this incident with Martin, he did not believe that police would help him. He felt that it would be 'his word against my word and there was[] no evidence.' He added, '[A]nd calling the police doesn't do too much good. The last time I got assaulted, the police said that if I was their kid they would have whooped my ass. Most of the police where I live always think I'm doing something wrong.' "

The minor's psychological tests showed that he was normal. The minor felt vulnerable. The minor did not share features with other young people who have chronic delinquent behavior. The minor did not score on the tests as an aggressive youngster with acting-out potential. His testing indicated he has difficulty reaching practical solutions when confronted with a problem. The psychologist concluded that the minor was like other learning-disabled children who have poor social skills and poor judgment. His ability to solve problems is below normal. The minor is not angry or aggressive. He has parental support. His parents have more skills than the average parent in assisting the minor. The high degree of support makes home supervision a good risk. This is balanced by the likelihood camp would expose him to seriously delinquent youths. The minor might again feel vulnerable with the tougher youngsters in camp. The offense is serious, but the error in decision-making can be remedied with home intervention.

The psychologist concluded that the minor has been impacted by his stay in juvenile hall and sees his misconduct as a mistake. The minor has the kind

of personal problems that can be addressed with home supervision. His educational needs are the same as other children in need of special education. The minor might benefit from out-of-public-school placement, since class size is smaller. This latter option is probably better for the minor than independent study. There are no psychological problems, but a brief, focused program of therapy could address problem solving when the minor feels threatened. Perhaps this could be combined with a volunteer program with the police department so he will see the police as friends rather than as adversaries.

At the commencement of the oral proceedings at disposition it was apparent the court had read and considered only the probation officer's original social study.

The court asked the prosecutor for a summary of the facts of the offense.

The prosecutor summarized the facts found in the arrest report. The prosecutor said the minor had an exchange of words at a convenience store with a 26-year-old adult male, Martin. Someone said, "Let's take it outside." They went outside and Martin threw a punch at the minor. The minor ran across the street. The minor took up a position of advantage in an alley. As Martin crossed the street, the minor fired three or four times at Martin with a handgun. There was a foot chase. The minor ran and was found by the police several blocks away hiding in the bushes, with the handgun nearby. No one was injured. The minor claimed he found the gun earlier that day.

The prosecutor asked for an order for camp placement and indicated that was the recommendation of the probation officer. The prosecutor urged the minor should not be returned home to the same neighborhood with the same set of people and friends, the situation which originally led him into trouble.

The court indicated the circumstances mandated a camp order. The court solicited the comments of the minor's counsel as to disposition.

The minor's counsel told the court the probation officer's recommendation had changed to home on probation. The court said it wished to read the new recommendation.

Counsel for the minor deferred obtaining the new social study until he argued disposition. Counsel argued the minor was impacted by the 55 days he had been confined in juvenile hall since detention. Counsel said the minor's description of the events of the shooting were consistent with the facts in the arrest report. Martin got into a punching match with the minor.

The minor ran away and was pursued by the victim. When the minor reached a position of safety, he was frightened since Martin was in pursuit and he shot at Martin. The minor claimed he fired the gun into the air to frighten Martin. At that point, Martin stopped the pursuit and flagged down the deputies.

The court asked counsel why the minor fled if he acted in self-defense. The minor's counsel replied that the minor was 14 years old, afraid and believed Martin was in pursuit.

The court commented the minor's conduct made no sense.

The psychologist who evaluated the minor was present in court. The court asked the psychologist where the minor claimed he obtained the handgun. The psychologist replied that the minor said he found the gun earlier in the day and was carrying it on his person. The court asked the psychologist, "That's pretty heavy stuff, isn't it, doctor?" The psychologist replied yes. The court asked if the psychologist believed the minor found the gun before the assault. The psychologist said she was not sure. The psychologist explained that she believes in some neighborhoods a gun is hidden for the use of kids and they know where it is. The court asked if the psychologist believed the minor fired the gun into the air. The psychologist replied, "I don't know." The court said it did not believe the minor found the gun or fired it into the air.

The court commented it was struggling over disposition. The court said the minor's situation still appeared to require camp placement.

The minor's counsel urged that the minor was frightened of Martin on this occasion due to the earlier assault by another adult. The court inquired if the assault was by the same adult. The psychologist said the assault was by a different adult.

The minor's counsel told the court the details of the unrelated assault were spelled out in the psychologist's report. Counsel explained that he had faxed a copy of the psychologist's report to the court and asked the court to read the report.

The court replied, "Counsel, I have the [the psychologist] right here in the courtroom. There's nothing startling that has come up. [¶] Everybody struggled to give me the facts. It's not just me."

The court probation officer informed the court that the probation officer had in fact changed his recommendation, and the probation officer would deliver the updated social study to the court.

The court called a recess in the proceedings and read both the psychologist's evaluation and the updated social study.

The court recommenced the proceedings. The court inquired about the minor's independent study and wished to know what was meant by the mother's remark the minor had not adjusted well in school.

The mother explained that the parents were unhappy with the minor's schooling at Westchester High School. The parents decided to remove the minor from school since he was having academic problems and "there were a lot of problems there." The parents wanted to increase the minor's academic skills by independent study and then put him into a private or better school. In the mother's view, Westchester High School simply was not offering the education they wanted for the minor.

The father further explained that the minor has a learning disability. He was not keeping pace with his class. Being behind lowered his self-esteem. The parents wanted to give the minor a chance to prove he could perform his schoolwork. In part the minor was not doing well since he was embarrassed he was behind. Independent study had provided him with the individual attention he needed to feel more confidence and to increase his skill levels.

The court inquired if independent study was truly helping him to learn how to get along in the world. The court said, "You meet a lot of stupid, jerky people. It's just the nature of life, and you've got to learn how to get past those people." The court commented that the minor did not learn how to get along with others in a bubble at home.

The father said the parents had the minor on an accelerated program to get him up to par and then would have him attend regular school sessions.

The court inquired about whether the parents had looked into the St. Bernard's School.

The mother replied that she was aware of St. Bernard's School, but did not think it was the best school. The mother said they had considered moving up north in hopes of putting the minor in a better school. The mother believed the minor was not missing out on socialization since they have a large family and the minor socialized with his sisters and their children. The one difficulty they had was that once a year her husband traveled as part of his employment. She and the minor accompanied her husband. The minor would get behind in school when they traveled.

The court said it had no doubt that the parents were doing their best for the minor. The court's concern was that the minor's offense was so serious. The

minor had fired a gun at someone. The court did not believe the minor found the gun or that he fired the gun into the air.

The minor's counsel argued the gun was seen only after the pursuit.

The prosecutor commented the case settlement was offered to the minor after his counsel claimed the minor's situation was mitigating, and his counsel did not wish the minor to have a serious or violent felony on his record. Thus, through negotiations, they had settled that the minor would admit a less serious charge. However, there was no agreement that the facts underlying the offense were anything but the assault described in the arrest report. The People were ready at adjudication to prove the assault. The case settlement was not due to any weakness in the People's evidence, but to a plea for leniency from the minor's counsel. Now the minor's counsel was attempting to do an "end-run" to avoid the dispositional consequences which flowed from the assault with a firearm.

The prosecutor told the court the handgun involved belonged to a deputy sheriff and was stolen from the deputy's automobile. The gun may have been fired in the air, but it was also fired at Martin, since there were bullet holes discovered in a wall of a church within two feet of his location when the shots were fired. The prosecutor urged that, "[B]ut for the grace of God, that bullet didn't connect with [Martin] and tragic circumstances, a tragic outcome, didn't ensue."

The court asked about the probation officer's latest recommendation for home on probation. The prosecutor commented that it was clear from the updated social study the probation officer did not entirely understand the terms of the case settlement. Also, the probation officer did not consider the minor's admissions of the shooting, which were included in the psychologist's evaluation.

The minor's counsel denied he was trying to "back door" anything. Counsel said that his argument was the minor did not initially approach the victim with the gun.

The court inquired of the parents why the minor was not at home doing his schoolwork on the Thursday of the shooting. The mother explained that on Thursdays the minor has his weekly appointment with his tutor. Her husband took him to the appointment at lunch. After the appointment, the parents give him a break and let him go outside. Her husband works only five minutes away from their home, and the incident occurred within blocks of home.

The minor's counsel argued mitigation for the shooting and acknowledged the minor admitted using very bad judgment. Counsel urged there was

nothing in the minor's psychological evaluation showing the minor was angry, disturbed, assaultive or a danger to the community. The minor was a shy, withdrawn boy, who had difficulty expressing his thoughts.

The court said: "I'm going to send the minor to camp. You've got a young man who just goes around the corner five minutes, and all of a sudden he's got a gun. [¶] The story is he found the gun. I don't believe that story. I do not believe it. He just left. He goes out, and he fires the gun at somebody."

The court also told the mother: "I know you're supportive, and I've said that, but I'm not going to let a young man that walks out and has the anger— [¶] . . . I've listened, and I've listened, and I've struggled; but I've read [the psychologist's] report . . . and that's what has pushed me over."

The court commented the minor shot at the victim three times with a gun he had hidden away from his parents and the offense was so serious that the court had no choice but to commit the minor to camp.

The mother protested she did not believe the minor kept a gun without his parents' knowledge. The court told the mother it was incredible that the minor fortuitously found the gun immediately before the shooting.

The mother protested the camp commitment was too harsh for her son. The mother requested permission to remove the minor from the state as an alternative to the camp order.

The court commented it had listened to everyone's comments as to disposition and read all the reports.

The minor's counsel suggested the court consider several less onerous dispositional alternatives, such as a house arrest program for 60 days, which had the effect of keeping the minor confined for four months following his arrest. The minor could attend therapy and resume full time schooling. Counsel commented the minor was not in gangs.

The court said it had listened to counsel's argument and would order camp. The court said, "I'm not going to tolerate anybody shooting guns like that, a semiautomatic weapon, period."

I

*The Court Did Not Abuse Its Discretion by Making the Camp Order*

 The minor makes several related contentions that the court abused its discretion by ordering the minor into the Camp Community Placement program.

The minor contends that, after the minor admitted only a lesser charge, the court improperly considered the underlying facts of the assault which is prohibited by *People v. Harvey* (1979) 25 Cal.3d 754 [159 Cal.Rptr. 696, 602 P.2d 396]. Welfare and Institutions Code section 725.5 requires that the court consider in addition to any other relevant and material evidence at disposition "the circumstances and gravity of the offense committed by the minor." This section and other relevant policies of juvenile court law require that the court consider "the broadest range of information" in determining how best to rehabilitate a minor and afford him adequate care. (*In re Jimmy P.* (1996) 50 Cal.App.4th 1679, 1684 [58 Cal.Rptr.2d 632]; *In re Raymond B.* (1981) 121 Cal.App.3d 785, 789 [175 Cal.Rptr. 359].) *People v. Harvey, supra,* 25 Cal.3d 754 has no application in juvenile court proceedings since it would limit the court's consideration of relevant evidence at disposition. The People graciously offered the minor leniency by arranging that he not have a "strike" offense on his record. That was the only end contemplated by the People when they exercised their discretion to afford the minor leniency. The case settlement agreement did not contemplate disposition would be determined on something less than the full truth regarding the events of the shooting. The court properly considered the facts that the minor shot at Martin without justification and fortunately missed.

The minor contends the court unreasonably relied upon certain negative aspects of the psychologist's evaluation in choosing camp and thus abused its discretion. The court considered the relevant information in the social studies and the probation officer's recommendations for camp and then for home on probation. The court at the minor's request also considered in mitigation the psychologist's evaluation of the minor's motivation for committing the shooting and the minor's dangerousness to the community. The court was not required to take all the information properly considered by it at face value. The court was entitled to evaluate the credibility of the minor and the weight to be afforded to the psychological evaluation, as well as to accept or reject the recommendations of the probation officer. (See *People v. Warner* (1978) 20 Cal.3d 678, 683 [143 Cal.Rptr. 885, 574 P.2d 1237].) This record does not reveal that the court unreasonably ignored the contents of the updated social study. The court simply rejected the recommendation for home on probation. The gravity of the offense dictated the camp order. The probation officer's recommendation for home supervision was in part based on the faulty premise the minor did not commit the assault.

The minor also contends the camp order was an abuse of discretion since it was based on the gravity of the offense alone and did not take into consideration the minor's parents provided him with adequate supervision at home. There is no merit to the contention. ■ A juvenile court's commitment order may be reversed on appeal only upon a showing the court

abused its discretion. (*In re Todd W.* (1979) 96 Cal.App.3d 408, 416 [157 Cal.Rptr. 802].) " 'We must indulge all reasonable inferences to support the decision of the juvenile court and will not disturb its findings when there is substantial evidence to support them.' " (*In re Lorenza M.* (1989) 212 Cal.App.3d 49, 53 [260 Cal.Rptr. 258].) ■ The court acted in this instance in conformity with the policies announced in Welfare and Institutions Code section 202. (See also *In re Teofilio A.* (1989) 210 Cal.App.3d 571, 576-577 [258 Cal.Rptr. 540].) The minor was upset a local (adult) youth was picking on him. The minor initiated a fight with the youth and then shot at the youth with a firearm, only fortuitously missing the youth when the youth tried to cross the street in pursuit. The minor apparently brought the firearm to the store in anticipation he would need it to best Martin in the fight. The court found the minor's attempt to shoot the youth was so serious that the protection of the public required the minor's custody be removed from his parents and that he spend a short period of confinement in camp.

The gravity of the offense is by statute a proper consideration at disposition. (Welf. & Inst. Code, § 725.5.) The court considered not only the gravity of the offense, but also the other circumstances unique to the minor. The court on this record properly could have concluded the parents were being overprotective about the minor's schooling and exposure to other youths. Furthermore, the minor's possession of a firearm suggested that he was operating on the periphery of a gang. His youthful companion at arrest possessed marijuana. It was to the minor's benefit to immediately return to full-time, verifiable schooling. On this record, the court properly exercised its discretion by concluding the minor should be committed to Camp Community Placement. (*In re James H.* (1981) 121 Cal.App.3d 268, 273-275 [175 Cal.Rptr. 141]; see also *In re Tyrone O.* (1989) 209 Cal.App.3d 145, 151-154 [257 Cal.Rptr. 134].)

II

*Conditions of Supervision*

■ The minor contends the court improperly imposed drug- and alcohol-testing conditions where there was no relationship between the offense and drugs or alcohol, and the imposition of these conditions violated his constitutional rights to privacy and due process of law. We reject the related contentions. The court made the camp order, but apparently was preoccupied with the major decision in the case of selecting an appropriate disposition. The court inadvertently failed to make further orders imposing conditions of supervision, including any provisions for testing the minor during supervision for drugs or alcohol. The court apparently intended to impose conditions of supervision since the court's minutes state the court imposed conditions Nos. 19, 20, 21, 23, 24 and 25 as part of its order.

Welfare and Institutions Code section 730 authorizes the court upon the camp order to make "any and all reasonable orders for the conduct of the ward" during his placement in camp and in the community following his release from camp. Furthermore, pursuant to Welfare and Institutions Code section 729, even when the minor remains in the custody of his parents, the court has the authority to require urine testing for the purpose of determining if the ward is using drugs or alcohol. (See *In re Kacy S.* (1998) 68 Cal.App.4th 704, 708-712 [80 Cal.Rptr.2d 432].)

The court in this instance did not impose any conditions of supervision along with its Camp Community Placement order. Such orders were required to be made orally on the record, and not later in a minute order. (See *People v. Hartsell* (1973) 34 Cal.App.3d 8, 13 [109 Cal.Rptr. 627].) Since there were no conditions of supervision imposed in this case, this appellate court cannot consider the issue of whether the conditions of supervision were reasonable and proper and if the conditions conformed to constitutional requirements. Since it appears the court inadvertently omitted to impose such orders, we will reverse the order of disposition insofar as the court did not complete disposition. We remand the cause for the court to make reasonable orders limiting the minor's conduct while in the Camp Community Placement program. Upon remand, the court shall consider any objections the minor makes to the conditions of supervision.

### III

*The Finding Required by Welfare and Institutions Code Section 726*

The minor contends the court failed to make the finding required by Welfare and Institutions Code section 726. We agree. The facts here are unlike those in *In re Kenneth H.* (1983) 33 Cal.3d 616, 620-621 [189 Cal.Rptr. 867, 659 P.2d 1156]. There is an appropriate recital in the minute order that "[t]here is a substantial danger to the physical/emotional health of the minor; [and] no reasonable means exist to protect the minor without removal from the parents'/guardians' physical custody." But there is no recommendation by the probation officer for removal of custody on statutory grounds. Nor is there a signed order by the juvenile court bench officer. Since we are remanding in any event for the court to impose appropriate conditions of supervision, we will also order the court to make the finding required by Welfare and Institutions Code section 726.

### DISPOSITION

The order of disposition is reversed insofar as the court failed to make reasonable orders limiting the minor's conduct under supervision under

Welfare and Institutions Code section 730 and the finding required by Welfare and Institutions Code section 726. Upon remand, the court shall determine if it wishes to impose conditions of supervision under Welfare and Institutions Code section 730 and the court shall make the finding required by Welfare and Institutions Code section 726. In all other respects, the orders under review are affirmed.

Johnson, J., and Perluss, J., concurred.

Appellant's petition for review by the Supreme Court was denied May 22, 2002. George, C. J., and Baxter, J., did not participate therein.