Filed 7/22/16  In re Antonio E. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| In re ANTONIO E., a Person Coming Under the Juvenile Court Law. | C079033 |
| THE PEOPLE,<br><br>                Plaintiff and Respondent,<br><br>        v.<br><br>ANTONIO E.,<br><br>                Defendant and Appellant. | (Super. Ct. No. 70481) |

Delinquent minor Antonio E. contends the juvenile court abused its discretion by committing him to the state Division of Juvenile Facilities (DJF).[1]  Disagreeing, we shall affirm.

---

[1] "Effective July 1, 2005, the correctional agency formerly known as the California Youth Authority (CYA) became known as [DJF].  DJF is part of the Division of Juvenile

1

## FACTUAL AND PROCEDURAL BACKGROUND

On June 19, 2014, the minor, born in March 1998, was made a ward (Welf. & Inst. Code, § 602)[2] based on his admission to robbery (Pen. Code, § 211), after dismissal of allegations of conspiracy and firearm-arming by a principal (Pen. Code, §§ 182, subd. (a), 12022, subd. (a)). The minor, accompanied by a second minor who pulled a handgun, approached the victim in the parking lot of a department store and said, "Give me the fucking money, bitch." The boys then took the victim's wallet and fled through a preschool parking lot, where the wallet and a loaded semiautomatic pistol were later found by peace officers, near the school's fence.

Although he was recommended for camp placement, the minor refused to cut his hair. On July 18, 2014, the minor was again offered camp placement, but he refused through counsel, so the juvenile court, noting the "chilling" nature of the brazen armed robbery, placed the minor in juvenile hall.

On October 8, 2014, a probation violation notice (VOP) was filed alleging the minor and another ward attacked a third ward. (Pen. Code, § 243, subd. (d).) Based on evidence, the minor (in concert with another ward) savagely attacked the victim; the juvenile court sustained the VOP.

A contested dispositional hearing was conducted on April 13 and 15, 2015. The probation department recommended a DJF commitment, summarizing the minor's contacts with the law and his behavior while in custody as follows:

Justice [DJJ], which in turn is part of the Department of Corrections and Rehabilitation. [Citations.] Statutes that formerly referred to CYA . . . now refer to DJF." (*In re Jose T.* (2010) 191 Cal.App.4th 1142, 1145, fn. 1.)

[2] Further undesignated statutory references are to the Welfare and Institutions Code.

2

In August 2010, the minor and two other juveniles sexually battered two female students in a school bathroom, before trying to prevent the girls from leaving; this led to the minor's expulsion. In December 2010, the minor was cited for telling a school teacher, " 'I'm gonna put a cap in your ass.' " In April 2013, the minor shoplifted from a store and refused to identify himself. In September 2013, the minor and four other juveniles were arrested in a vehicle that had been stolen at gunpoint, during which time the victim had been struck in the head. In February 2014, the minor was suspended from school for smelling like marijuana, despite prior warnings, and the teacher saw that the minor's cell phone screen-saver was a picture of the minor pointing a shotgun. While in juvenile hall, the minor received 33 negative behavioral reports, and was involved in eight fights. Because of his recalcitrance, the probation officer believed the minor needed a "highly structured, secured facility." At the DJF, he could receive education and counseling to assist him, otherwise, "the undersigned feels strongly that the minor will seriously injure or kill someone or meet an untimely demise if allowed back on the street. The fear is that the minor will continue down this road of criminal activity and it will more than likely lead him to an unfortunate end, as thus far, nothing has made a big enough impact on him to turn his delinquent behavior around. He has proven to be a danger to the free community, and continues to prove to be a danger while in the custody of San Joaquin County Juvenile Hall and thus an even more secure environment is needed to prevent more victims at the hands of this minor."

The minor filed a written opposition, contending in relevant part that he had "not been tried on lesser restrictive programs or counseling" and had not previously been on probation, and arguing a DJF commitment should be considered only as a last resort.

At the dispositional hearing, psychologist Dr. Baljit Atwal testified for the minor.[3] She had expertise in juvenile dispositions and risk assessments. She had been given the dispositional and other relevant reports, had evaluated the minor for over six hours, and administered to him a variety of assessment tests. She found he was in the "borderline intellectual functioning range, so that is quite . . . significantly below average. And specifically in the verbal area." She thought he might have a learning disability and would recommend that he be evaluated for that, although she did not do so. His condition would make him easily confused, frustrated, and impulsive, and he would be easily persuaded by others. His avoidance of school was due to a desire to avoid being labeled " 'stupid' " and this led him to associate with "more delinquent peers," use marijuana, and "spiral downward." The minor claimed trauma from seeing the in-situ body of a cousin who was shot in 2010 or 2011, from which he still had "vivid nightmares" that would increase his anxiety and disturb his sleep. The treatment for this that he had received at juvenile hall was inadequate because it focused on self-calming techniques that simply addressed the symptoms of trauma. Atwal testified the minor also had a history of being beaten as a child. At age 15, the minor's father left the home, his mother remarried, and school became more difficult, at which point the minor began skipping classes, stopped going to church, and began using marijuana. Atwal recommended "some sort of out-of-home placement" with behavioral rewards, adverse consequences, and close monitoring. He would benefit from smaller groups, whereas larger facilities "are geared towards the average person" and would not provide the minor the individualized attention he needed; further, he needed to be kept with others in his age

---

[3] Dr. Atwal's report, introduced as Exhibit 101 at the hearing, is not in the record. Appellate counsel sought to augment the record with it, but the juvenile court clerk filed a declaration stating it was returned to trial counsel. It is not clear what further steps, if any, appellate counsel took to obtain the report.

group, not with more sophisticated persons. The minor "is easily provoked to lash out in verbal or physical aggression when he feels threatened" and he needed to learn how to control anger, but he did not show signs of chronic or ingrained hostility, which boded well for the efficacy of a good treatment program. Also in the minor's favor was the fact that he did not have a major mental illness, and understood right from wrong. As an example, when Atwal discussed with the minor why he previously had refused camp because he would have to cut his hair, he eventually understood--albeit with some reluctance--the longer-term benefit of a camp placement, versus the relative low harm to him of cutting his hair, and this ability to weigh consequences, too, boded well for his future progress.

In conclusion, Atwal recommended against DJF "mostly because at this age, the more therapeutic of an environment that he can get, and the more access he can have to a normal life [rather than] an institutionalized experience, the greater the likelihood that he is going to become a law-abiding citizen instead of [a] career criminal. [¶] And my concern is that if he is around criminally sophisticated individuals, be they peers or adults, he is . . . going to be exploited . . . because he's not going to have the autonomy or the sense of self to protect himself."

On cross-examination, Atwal conceded she had not toured DJF facilities since before 2000, but tried to "stay in touch with the programs that they have," particularly regarding juvenile sex offenders. She conceded the minor's testing showed a high risk of future violence, and although she did not know of a group home that would take him, she thought there were "structured programs" available. Despite not having visited DJF facilities for a long time, she believed "the environment is harsher" and the minor would do better elsewhere.

Doug Ugarkovich, a DJF employee for over 25 years (i.e., beginning when it was known as CYA, see fn. 1, *ante*) is a "Parole Agent III" and his work involves reviewing DJF referrals from counties and liaising with county probation officers preparing

5

dispositional reports. Previously, he was a youth counselor at CYA. Due to litigation, DJF has improved its operations since 2004, including educational and mental health programming, and outside experts audit its reforms. The population at CYA in 1996 was over 10,000; now it is less than 700, which means "less youth on the living unit and a higher concentration of staff." Cognitive behavioral therapy is now available and "all of our programs and interventions . . . are evidence-based, meaning studies have shown they're effective in lowering the likelihood of a youth reoffending." He had heard Atwal's testimony, and her description of what the minor needed was available at DJF, including behavioral therapy, vocational training, mental aggression interruption training, substance abuse, special education, including aiding in verbal deficiencies, and mental health care; the state facilities are no longer as "punitive" as they were in the past. Although Ugarkovich is not permitted to comment on the appropriate disposition for any particular minor, in his opinion "Antonio's profile closely correlates with the profile of many of our youth" in terms of the offense committed (robbery), his conduct disorder, and trauma. If committed to DJF, the minor would receive a full psychological, educational, and health assessment at intake. Ugarkovich conceded that wards up to age 23 can be kept at DJF.

Minor's trial counsel tried to denigrate Ugarkovich's opinions by suggesting he never had post-high school training, whereupon Ugarkovich interrupted to testify he had a bachelor's degree in psychology, and a master's degree in counseling psychology.

Minor's counsel argued a less-restrictive placement had not been tried, and placing the minor with more sophisticated criminals would not help to him; instead, placement with his mother or at camp would be appropriate. The People argued that the services Atwal thought the minor needed were not "that far off" from what Ugarkovich testified was now provided at DJF, and emphasized the minor's poor behavior while in juvenile hall and high risk for future violence.

6

The juvenile court emphasized that, while in juvenile hall, the minor participated in a vicious attack on another ward, refuting the idea that he was taking "advantage of what was afforded him when he was given a chance not to go to [DJF]." The attack resulted in serious injuries. Dr. Atwal's own report rated the minor a 92, the maximum risk range on the violent scale, and the minor had committed a serious crime in the original petition. The juvenile court was personally aware of some abysmal conditions in the CYA in the past, "It was a prison. It was a dangerous place to be by [all] accounts. And obviously some court agreed with that, because they had a consent decree and they changed the way they do business. [¶] And I've heard this now on multiple occasions since I've been here since 2014. It's not the same [place] as it was. And I think that it is a safe environment. I think there are programs there." The juvenile court viewed a DJF commitment as another chance for the minor to conform his behavior, whereas he was unlikely to succeed in a group home facility.

The juvenile court then committed the minor to DJF.

The minor timely appealed from the order of commitment.

## DISCUSSION

"A juvenile court's commitment order may be reversed on appeal only upon a showing the court abused its discretion. [Citation.] ' "We must indulge all reasonable inferences to support the decision of the juvenile court and will not disturb its findings when there is substantial evidence to support them." ' " (*In re Robert H*. (2002) 96 Cal.App.4th 1317, 1329-1330.)

A trial court abuses its discretion when it acts in disregard of the legal standards applicable to the decision at hand. (See *County of Yolo v. Garcia* (1993) 20 Cal.App.4th 1771, 1778; *City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297-1298.)

Delinquent minors "shall, in conformity with the interests of public safety and protection, receive care, treatment, and guidance that is consistent with their best interest, that holds them accountable for their behavior, and that is appropriate for their

7

circumstances. This guidance may include punishment that is consistent with the rehabilitative objectives of" the juvenile court laws. (§ 202, subd. (b).) "In reaching a disposition, the court considers (1) the minor's age, (2) the circumstances and gravity of the offense, and (3) the minor's previous delinquent history. (§ 725.5.)" (*In re Greg F.* (2012) 55 Cal.4th 393, 404.) There must be evidence demonstrating a probable benefit to the minor by a DJF commitment and the inappropriateness or ineffectiveness of lesser alternatives, though a court need not actually place a minor through lesser alternatives if it determines a DJF commitment is appropriate in the first instance. (See *In re Eddie M.* (2003) 31 Cal.4th 480, 507; *In re Angela M.* (2003) 111 Cal.App.4th 1392, 1396; *In re Asean* (1993) 14 Cal.App.4th 467, 473.) The juvenile court must find that the ward will be benefited by the reformatory educational discipline or other treatment provided by DJF. (§ 734; see *In re Edward C.* (2014) 223 Cal.App.4th 813, 829.)

On appeal, the minor contends the trial court abused its discretion in committing him to DJF because the juvenile court failed to consider less restrictive alternatives, and a DJF commitment would be inappropriate because of the minor's age, intellectual functioning, compromised language skills, lack of an adequate mental health plan, and risk of "exploitation by older, more criminally sophisticated" detainees.

This claim is made plausible only by means of omission of facts and by assuming the trial court had to view Dr. Atwal's testimony in the light favorable to the minor. But this is not the case. (*In re Robert H.*, *supra*, 96 Cal.App.4th at pp. 1329-1330.)

First, the minor was 17 at the time of disposition (and is now 18), so the juvenile court could reasonably find that he was not at significant risk of exploitation from older wards, even if there are some young adults (up to age 23) housed at DJF.

Second, a less restrictive placement *had* been tried, in that the minor had been placed at the local juvenile hall, with an extremely poor outcome. As the record before the juvenile court shows, the minor had repeatedly and at times violently disobeyed the rules of the local facility. Even Atwal's testing revealed the minor was at high risk of

8

violent reoffense. Thus, the juvenile court could rationally reject the feasibility of placement of the minor at home or in a group home, either of which would be less restrictive than juvenile hall, where the minor's misconduct continued.

Third, the minor's briefing assumes the juvenile court was required to accept Atwal's opinion. However, a trier of fact is permitted to reject even the uncontradicted testimony of a witness, expert or otherwise. (See *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 890; *In re Robert H.*, *supra*, 96 Cal.App.4th at p. 1329 ["The court was not required to take all the information properly considered by it at face value. The court was entitled to evaluate . . . the weight to be afforded to the psychological evaluation, as well as to accept or reject the recommendations of the probation officer"].) Here, although reasonable judicial minds may have come to different conclusions, it was not irrational for the juvenile court to reject Atwal's views, based on her lack of familiarity with the current conditions in DJF, and instead to accept Ugarkovich's view that DJF could provide the minor essentially all the services Atwal thought he needed. Ugarkovich had a master's degree in psychology, and over 25 years of experience in the juvenile justice system, including as a CYA counselor. From his testimony the juvenile court could conclude he had more accurate information about the *current* conditions and programs in the state juvenile facilities than did Atwal, and could find that DJF was capable of adequately assessing the minor to determine what services the minor needed, and was capable of providing appropriate services to him.

Finally, the minor posits that the dispositional order was retributive, due to the minor's refusal to cut his hair. The juvenile court did state at one point during colloquy at the dispositional hearing that "[t]he best thing he could have done . . . to convince me he wanted to go to camp, was come in [to court] with a camp haircut." But in making the dispositional order, the juvenile court referenced the minor's failure to abide by juvenile hall rules, including participating in a violent assault, the high-risk of reoffense shown by Dr. Atwal's assessment, the seriousness of the robbery which made the minor a ward of

9

the court, and the significant changes in DJF over time, and did not reference the minor's lack of a haircut in making its ultimate findings. The record does not support the view that the DJF commitment was imposed as punishment by the juvenile court for the minor's refusal to cut his hair.

We find no abuse of discretion by the juvenile court.

## DISPOSITION

The orders of the juvenile court are affirmed.


                                        _____/s/_____
                                        Duarte, J.



We concur:



_____/s/_____
Butz, Acting P. J.



_____/s/_____
Murray, J.