Filed 7/14/25  In re J.J. CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re J.J., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br> J.J.,<br><br>    Defendant and Appellant. | F087720<br><br>(Super. Ct. No. JW141145-01)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Marcus Cuper, Judge.

Robert McLaughlin, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Darren K. Indermill and John W. Powell, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Appellant J.J. challenges the juvenile court's order setting his baseline term of confinement at seven years after finding true he committed first degree murder, first degree robbery and that the murder was committed during the perpetration of a robbery.

On appeal, J.J. contends the juvenile court abused its discretion when it set his baseline term of confinement at seven years, claiming it was excessive. The People disagree and contend the juvenile court decision is supported by the record. We conclude J.J. fails to demonstrate the juvenile court abused its discretion and affirm the judgment.

## BACKGROUND

D.K. Sr. lived in a house on University Avenue in Bakersfield with his son, D.K. Jr., his daughter J.K. and D.K. Jr.'s children F.K., Jo.K. and B.K. D.K. Jr. was blind in one eye. In August 2022, J.K. invited two homeless teenagers, S.D. and K.M., to stay with them. The house had one bedroom that was described as the "safe room" with an ammunition reloader and two safes that contained about 40 guns, jewelry, money and some silver coins. D.K. Sr. kept a shotgun in his bedroom, either under the mattress or against the wall.

On August 21, 2022, Jo.K. saw S.D. and K.M. playing with D.K. Sr.'s shotgun and heard them shooting a gun three or four times outside in front of the house. S.D. and K.M. went back inside the house and began kicking the door to the safe room trying to get in. Jo.K. heard S.D. and K.M. grabbing items inside the safe room and heard "dinging sound[s]" like shotgun shells hitting the floor. S.D. and K.M. went into the backyard and Jo.K. heard two more gunshots. Jo.K. heard S.D. talking on the phone in the backyard and heard him say, "There's safes in the room and I got in." Jo.K. observed a hole in the bottom of the door to the safe room. When F.K., B.K., and D.K. Jr. came home, they noticed that the safe room door had been damaged. The bottom of the door was broken in such a way that a person would have been able to crawl through it. Jo.K. told D.K. Jr. that S.D. and K.M. had entered the safe room and had fired guns outside.

2.

Around 11:00 p.m., J.J. picked up A.M. in a vehicle and drove to the University Avenue residence to rob it. Around that time, B.K. overheard S.D. on the phone in the living room saying, "you [can] come over. We're ready. We have the gun." Approximately 30 minutes later, F.K. and B.K. were in their bedroom with D.K. Jr. when they heard a loud bang and saw two masked individuals enter the room, one carrying D.K. Sr.'s shotgun. The intruder with the shotgun, A.M., pointed it at D.K. Jr.'s face and said "give me everything you've got .…" D.K. Jr. then grabbed the shotgun barrel and tried to take the shotgun from A.M. While they struggled over the shotgun, the second intruder, J.J., punched D.K. Jr. in the back of the head and stabbed D.K. Jr. in the back multiple times with a screwdriver. F.K. noticed S.D. in the room watching and egging on the intruders saying "[G]et that [N*****]." F.K. recalled screaming for S.D. to help her father, but S.D. "completely ignored" her.

During the struggle, D.K. Jr. eventually gained some leverage on the shotgun, pushed the barrel upward, pulled the trigger and fired it straight into the air, hitting A.M. in the head. After the gun was shot, J.J. ran out of the house, got into his vehicle and quickly drove away. S.D. fled the scene, but later returned and surrendered to the police.

A.M. died at the scene from the shotgun injury to his head. DNA evidence taken from the screwdriver used to stab D.K. Jr. showed J.J. was a potential contributor.

Before the incident, F.K. helped S.D. create a new Instagram account using F.K.'s phone number. After the robbery, F.K. logged into S.D.'s Instagram account using her phone number and saw S.D. posted a video in his story about the ammunition that D.K. Sr. kept in the safe room. Instagram messages revealed S.D. conspired with A.M. and J.J. to rob the house and gave them the green light on the night of the incident. S.D.'s messages revealed the person that was home did not have a gun on him, was blind in one eye, and that there was money and more guns in the house and it was okay to come in. Voice messages from S.D. revealed plans to rob the house, noting there were three safes in the house with a lot of guns and money, that he would kick open the door to the safe

3.

room ahead of time, that they needed to use a car, that it had to be that night because the dad was gone and only the son who is blind in one eye was there. Recovered text messages revealed J.J.'s involvement with the planning: J.J. indicating he is down with the robbery, asking questions about what gun they are going to use, and making sure S.D. is going to be at the house. Messages between J.J. and A.M. showed them working out the time for the robbery, indicating the car they are going to use, what masks they are using, confirming the robbery is a go, and then A.M. telling J.J. he is on his way to pick him up. Then, before the incident, S.D. said they could come right now, that the occupants of the house were in the bedroom, and to let S.D. know when they get to the house so he could give them the shotgun.

On March 23, 2023, an amended original juvenile wardship petition was filed, pursuant to Welfare and Institutions Code section 602,[1] alleging J.J. committed first degree murder (Pen. Code, § 187, subd. (a), count 1), with an enhancement for committing the crime while perpetrating a robbery (*id.*, § 189), and first degree robbery within a dwelling house while acting in concert with others (*id.*, § 213, subd. (a)(1)(A), count 2).

A joint contested jurisdictional hearing for J.J. and S.D. began January 3, 2024. The juvenile court found counts 1 and 2 against J.J. true beyond a reasonable doubt, and the robbery enhancement true. At the January 30, 2024 dispositional hearing, the court adjudged J.J. a ward of the court and committed him to the APEX academy for a baseline term of seven years. J.J. filed a timely notice of appeal.

## DISCUSSION

### I.    The Juvenile Court Did Not Abuse its Discretion

J.J. contends the juvenile court abused its discretion when it set his baseline term of confinement at seven years, claiming the seven-year term is excessive considering his

---

[1]    All undesignated statutory references are to the Welfare and Institutions Code.

subordinate role in the incident and personal history. The People disagree and argue the court's ruling is supported by the record. We conclude the court did not abuse its discretion in setting J.J.'s baseline term of confinement at seven years.

## A.      Relevant Factual and Procedural History

The probation department concluded in its report that the egregious nature of J.J.'s offenses, his well-documented and ongoing propensity for violence, and his lack of remorse warranted a commitment to APEX Academy. As to the appropriate baseline term of confinement, probation noted that J.J.'s baseline range is four to seven years based on his offenses. Probation recommended J.J.'s baseline term be set at seven years based upon the "circumstances and gravity of the offense(s), [J.J.'s] history in the juvenile justice system, the confinement time necessary to rehabilitate [J.J.], and [his] developmental history."

J.J.'s counsel disagreed with the probation officer's recommendation and asked the court to consider sending him to Crossroads, which is a less restrictive program than APEX. The prosecutor urged the court follow the probation officer's recommendation and commit J.J. to APEX until he reached 25 years old, and to set his baseline term of confinement at seven years. The prosecutor noted J.J.'s involvement in the offenses was not just a "boneheaded mistake," but a "preplanned heinous crime committed against a man that [J.J.] and his accomplices knew to be in a weakened state [in] that he was partially blind." Additionally noting the robbery victim and his children were in the home when the crime occurred, which resulted in the death of J.J.'s accomplice.

The juvenile court heard witness testimonies, considered the probation report and victim impact statements, and heard arguments from counsel. The court first determined the APEX Academy was the proper placement for J.J., giving the following reasons:

> "The first step in the Court's analysis, which is guided by … Section 875, is to determine whether or not there is a less restrictive alternative disposition that would be suitable for [J.J.] than the APEX Academy, and I'm guided by a number of factors listed in … Section 875,

5.

specifically subdivisions (a)(3), large (A) through large (E), and it starts with the severity [of the] offense[,] including [J.J.'s] role in that offense, his behavior, and the harm done to the victims.

"[T]his was a—an incredibly severe offense in which [J.J.] participated with two other[s]—one was a minor and one was a young adult—to commit a home invasion robbery where a loaded firearm was provided to the young adult, and it appeared to the Court that there was a lot of planning that went into this particular offense.

"[A] series of Instagram messages that came in as evidence that showed us a level of sophistication and planning that was very troubling for the Court where [J.J.] and his co-participant, the minor, [S.D.], were able to acquire a loaded shotgun from the home, in which they attempted to burglarize and then rob the homeowners.

"They were able to know what time of day the patriarch of that home was going to be gone so that the only adult male left was partially blind. He was blind in one eye. And that was something that was discussed on the Instagram messages a couple of times. So it appeared that they tried to find a particularly vulnerable state of the home and the occupants in it when they committed this particular crime.

"And then they went and obtained masks to evade detection. [J.J.] was—we have evidence that he went and got a vehicle so that he could use [it] to escape when he left and obtained a ski mask, which both he and the young male who participated in this wore during the commission of the crime, to evade detection.

"Once [J.J.] was caught, he was in possession of the young deceased man's phone, which was heavily damaged, and the social media account on [J.J.'s] phone had been recently cleared."

The court relied on this evidence to consider there was a lot of thought and planning involved, and not some "knee-jerk reaction to commit a crime." The court noted that during the offense, a shotgun was aimed at young children and then at a man who was blind in one eye. Moreover, the court found J.J.'s behavior in which he repeatedly stabbed the partially blind man in the back with a screwdriver to be about as serious as it gets. And that these behaviors ultimately led to the death of one accomplice.

6.

Second, under section 875, subdivision (a)(3)(B), the court considered J.J.'s previous delinquent behavior, noting this was his second time before the juvenile court. J.J.'s prior offense was a conspiracy to commit a burglary, making this his second case involving a conspiracy. In 2022, while at Bridges Academy, J.J. had six disciplinary issues. While detained on this offense, J.J. had been involved in mutual fights and in possession of a controlled substance. J.J. engaged in 13 behavior health sessions, but also refused 16 remaining sessions. J.J. has seen a psychiatrist and was diagnosed with nightmare disorders, anxiety, and conduct disorder.

Under section 875, subdivision (a)(3)(C), the court considered the ability of APEX Academy to meet the program, treatment, education and security needs of J.J. The court noted APEX offered crisis intervention, emotional support, daily structured programming to benefit J.J.'s participation and development, and individual case plans, which include behavioral health, individual therapy, with an emphasis on trauma, anger, relationships and other potential mental health issues. APEX also offered local college classes and vocational programs. Although J.J. requested Kern Crossroads, the court noted its 24- and 36-week commitment programs offer several enrichment programs that would be helpful, but the programs are not deemed long enough to address the needs that would help improve J.J.'s behavior in the future.

Last, under section 875, subdivision (a)(3)(E), the court considered J.J.'s "age, maturity, mental and emotional health, sexual orientation, gender identity, and expression and any disabilities or special needs." At the time of the hearing, J.J. was 18 years old. The court noted he had a very difficult time in his younger years. His father was in prison for most of his life and he had a negative relationship with his mother before the age of 14 until J.J. realized "his mother was just looking out for his best interest."

In assessing the baseline term for J.J., the court acknowledged first degree murder was a category A offense with a baseline term ranging from four to seven years. In setting his baseline term at seven years, the court said it "considered the circumstances

and gravity of the offense, [J.J.'s] history in the Juvenile Justice System, the confinement time necessary to rehabilitate him, and his developmental history." The court acknowledged it was required to consider the factors contained in California Rules of Court, rule 5.806(b),[2] which it stated were nearly identical to the factors listed in section 875. Therefore, the court adopted its findings in determining that APEX was the most suitable placement in establishing J.J.'s baseline term at seven years "since the factors are almost identical and substantially similar."

The court noted J.J. was already a ward of the court and that "[p]revious orders of the Court have not been effective in [J.J.'s] rehabilitation. Less-restrictive programs would be unsuitable in meeting his rehabilitation and community safety goals."

Neither J.J. nor his counsel objected to the baseline term of seven years.

## B.     Standard of Review

A juvenile court's commitment decision is reviewed for abuse of discretion. (*In re Robert H.* (2002) 96 Cal.App.4th 1317, 1330 (*Robert H.*).) The reviewing court will ""'"indulge all reasonable inferences to support the decision of the juvenile court and will not disturb its findings when there is substantial evidence to support them."'"" (*Ibid.*; see *In re Carlos J.* (2018) 22 Cal.App.5th 1, 5 (*Carlos J.*) [we review the court's findings for substantial evidence].)

The abuse of discretion standard of review "asks in substance whether the ruling in question 'falls outside the bounds of reason' under the applicable law and the relevant facts [citations]." (*People v. Williams* (1998) 17 Cal.4th 148, 162; accord, *In re Oscar A.* (2013) 217 Cal.App.4th 750, 755 [""'"[D]iscretion is abused whenever the court exceeds the bounds of reason, all of the circumstances being considered."'""].) ""'"[A juvenile] court abuses its discretion when the factual findings critical to its decision find no support

---

[2]     All undesignated rules are to the California Rules of Court.

in the evidence.'"'" (*Carlos J., supra,* 22 Cal.App.5th at p. 5; accord, *In re Khalid B.* (2015) 233 Cal.App.4th 1285, 1288.)

**C.     Applicable Law**

Effective May 14, 2021, Senate Bill No. 92 (2021–2022 Reg. Sess.) added section 875 et seq. to the Welfare and Institutions Code.  (Stats. 2021, ch. 18, § 12; *In re J.B.* (2022) 75 Cal.App.5th 410, 427, fn. 2 (dis. opn. of Lie, J.).)  "Section 875, subdivision (b)(1), provides that the court must 'set a baseline term of confinement' that 'shall represent the time in custody necessary to meet the developmental and treatment needs of the ward and to prepare the ward for discharge .…'" (*In re Jose R.* (2024) 102 Cal.App.5th 839, 846, fn. omitted (*Jose R.*).)  "The baseline term is subject to potential downward modification … during progress review hearings that must be held at least once every six months.  (§ 875, subds. (b)(1) & (e).)" (*Id.* at pp. 846–847.)

Effective July 1, 2023, the juvenile court was required to set the baseline term using an offense-based matrix developed by the Judicial Council.  (§ 875, subds. (b)(1) & (h); rule 5.806.)  Within this range, the juvenile court must review and consider the following criteria in order to select the individual baseline term, and may give weight to any relevant factor listed under the criteria:

(1) The circumstances and gravity of the commitment offense, which includes: (A) the severity and statutory degree of the offense for which the youth has been committed to the secure youth treatment facility; (B) the extent of harm to victims occurring as a result of the offense; (C) the role and behavior of the youth in the commission of the offense; (D) the role of coparticipants or victims in relation to the offense; and (E) any exculpatory circumstances related to the commission of the offense including peer influence, immaturity or developmental delays, mental or physical impairment, or drug or alcohol impairment.

(2) The youth's prior history in the juvenile justice system, which includes: (A) the youth's offense and commitment history; (B) the success of prior efforts to

rehabilitate the youth; and (C) the effects of the youth's family, community environment, and childhood trauma on the youth's previous behavior that resulted in contact with the juvenile justice system.

(3) The confinement time considered reasonable and necessary to achieve the rehabilitation of the youth, which includes:  (A) the amount of time the youth has already spent in custody for the current offense and any progress made by the youth in programming and development; (B) the capacity of the secure youth treatment facility to provide suitable treatment and education for the youth; (C) special needs the youth may have in relation to mental health, intellectual development, academic or learning disability, substance use recovery, and other special needs that must be addressed during the term of confinement; (D) whether the youth is pregnant, is a parent, or is a primary caregiver for children; and (E) the availability of programs and services in the community to which the youth may be transitioned from secure commitment to less restrictive alternatives.

(4) The youth's developmental history, which includes:  (A) the age and overall maturity of the youth; (B) developmental challenges the youth may have in relation to mental health, intellectual capacity, educational progress or learning disability, or other developmental deficits, including specific medical or health challenges; (C) the youth's child welfare and foster care history including abandonment or abuse by parents or caregivers or the incarceration of parents; (D) harmful childhood experiences, including trauma and exposure to domestic or community violence, poverty, and other harmful experiences; and (E) discrimination experienced by the ward based on gender, race, ethnicity, sexual orientation, or other factors.  (Rule 5.806(b).)

"The court must select a baseline term that is no longer than necessary to meet the developmental needs of the youth and to prepare the youth for discharge to a period of probation supervision in the community.…  The court must state on the record its reasons

10.

for selecting a particular term, referencing each of the criteria and any factors the court deemed relevant." (Rule 5.806(b).)

The Advisory Committee comment to rule 5.806 notes that "the committee sought to accomplish three primary goals that should serve as objectives for the court when setting a baseline term: positive youth development, public and community safety, and the establishment of flexible and fair commitment terms." (Advisory Com. com., rule 5.806.) "A primary objective of a commitment to a secure youth treatment facility must be an evidence-based and trauma-responsive effort to promote healthy adolescent development." (*Ibid*.) "The flexibility inherent in the matrix is intended to result in a baseline term of commitment that is no longer than necessary to protect the public but is of sufficient length to assure the victim and the community that the harm committed can be redressed by the juvenile justice system in a developmentally appropriate manner and thus reduce the need for the youth to be transferred to criminal court." (*Ibid*.)

### D. Analysis

Substantial evidence supports the juvenile court's decision that J.J. should be committed to APEX for a seven-year baseline term of confinement. The record shows the court considered the criteria under rule 5.806(b) in concluding that a seven-year baseline term of confinement was required in order to meet J.J.'s developmental and treatment needs. Therefore, J.J. fails to show the court abused its discretion in setting a baseline term of seven years.

Here, the record demonstrates the juvenile court followed the applicable rules and criteria in setting J.J.'s baseline term at seven years. Rule 5.806(b) states, "the court must review and consider each of the criteria listed in paragraphs (1) through (4)[, and] may give weight to any relevant factor, including but not limited to the factors listed below each one." At the hearing, the court explained that in setting the baseline at seven years, it adopted its findings on determining APEX was the most suitable placement for J.J., stating the factors are almost identical to the rule 5.806(b)(1) through (4) factors. The

11.

court expressed that it had "considered the circumstances and gravity of the offense, [J.J.'s] history in the Juvenile Justice System, the confinement time necessary to rehabilitate him, and his developmental history." (See rule 5.806(b).)

We examine each factor separately. First, the court considered the circumstances and gravity of the offenses under rule 5.806(b)(1), which weighed in favor of the seven-year baseline term. J.J. committed first degree murder, which is a category A offense. The court considered this an "incredibly severe offense" that involved a lot of planning, which was not the result of an impulsive decision. Evidence showed J.J. and his coparticipants acquired a loaded shotgun from the residence they planned to rob, wore masks to hide their identity, and took advantage of a particularly vulnerable situation when the patriarch of the home was gone, leaving only the partially blind adult male at home. During the offense, a shotgun was aimed at young children and then at the man who was blind in one eye. J.J. repeatedly stabbed the partially blind man in the back with a screwdriver. The court felt these behaviors were "as serious as it gets" and they ultimately led to the death of one accomplice.

Under rule 5.806(b)(2), J.J.'s previous delinquent history also weighed in favor of the seven-year baseline term. The court considered J.J.'s previous delinquent behavior, noting this was his second time before the juvenile court. J.J.'s prior offense was a conspiracy to commit a burglary, making this his second case involving a conspiracy. J.J. had six disciplinary issues in 2002 while at the Bridges Academy. While detained on this offense, J.J. had been in mutual fights and in possession of a controlled substance. J.J. engaged in 13 behavior health sessions, but refused 16 remaining sessions. J.J. has seen a psychiatrist and was diagnosed with nightmare disorders, anxiety, and conduct disorder.

The record supports the court's imposition of a seven-year baseline term was reasonable and necessary to achieve J.J.'s rehabilitation under rule 5.806(b)(3). The court explained that J.J. needed the numerous programs and mental health support available through APEX. The court found that shorter programs would not be enough to address

12.

J.J.'s needs or to help improve his behavior. J.J. was already a ward of the court, had been tried on probation in the youth detention center (YDC) and failed to reform. The record showed that previous orders of the Court had not been effective in J.J.'s rehabilitation. Therefore, the evidence supports the court's conclusion that "[l]ess-restrictive programs would be unsuitable in meeting [J.J.'s] rehabilitation and community safety goals."

Last, facts relevant to J.J.'s developmental history under rule 5.806(b)(4) supports the seven-year baseline term. The court acknowledged J.J. was 17 years old at the time of the offense. J.J. had a difficult time in his younger years, when his father was in prison and J.J. had a negative relationship with his mom. However, J.J. later realized that his mother was looking out for him. Overall, J.J. had a positive family history and was loved and well cared for.

Significantly, J.J. does not argue that the juvenile court failed to consider the proper factors under rule 5.806(b). Rather, J.J. restates the relevant facts before the court and disagrees with the court's decision. Under rule 5.806(b)(1), J.J. contends his involvement in the crime was minimal and a last minute, spur of the moment decision, brought in by A.M.'s extravagant promises. However, the fact that J.J. helped work out details for the robbery, suggested they use masks and repeatedly stabbed D.K. Jr. with a screwdriver fails to support his claim his actions were minimal and that he "acted in a subordinate role." Under rule 5.806(b)(2), J.J. concedes his rehabilitation efforts in the past yielded mixed results, including unresolved substance abuse and disciplinary behavior reports, but contends that while at YDC he was making consistent progress in a short period of time.

Last, under rule 5.806(b)(3), J.J. contends the court failed to adequately consider the confinement time required to achieve rehabilitation. However, the court did consider the confinement time, capacity and suitability of the treatment facility, along with the length of programming that was necessary to address J.J.'s rehabilitative needs. The probation report

noted that J.J. required "a more intense structured rehabilitative environment which would ensure a lengthy period of treatment and provide for the protection of the community."

Therefore, the record contains substantial evidence in support of the juvenile court's seven-year baseline commitment term. (See *Robert H.*, *supra*, 96 Cal.App.4th at p. 1330.) The record shows the juvenile court carefully considered the proper criteria under rule 5.806(b) in imposing the seven-year baseline term. J.J.'s disagreement with the court's ruling based on facts before the court does not establish that the challenged ruling was an abuse of discretion. (See *People v. Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 978 [a discretionary sentencing decision will not be reversed merely because reasonable people might disagree, and an appellate court is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge], superseded by statute on other grounds as indicated in *People v. Lynall* (2015) 233 Cal.App.4th 1102, 1108.) J.J. fails to demonstrate the court's decision was arbitrary or lacking in factual support. (See *Jose R., supra*, 102 Cal.App.5th at p. 846.) Accordingly, we cannot conclude the juvenile court abused its discretion.

## DISPOSITION

The judgment is affirmed.


MEEHAN, J.

WE CONCUR:


LEVY, Acting P. J.


FRANSON, J.

14.