Filed 9/30/21  In re J.S. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re J.S., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,  Plaintiff and Respondent,  v.  J.S.,  Defendant and Appellant. | A161062  (San Mateo County Super. Ct. No. 19JW0401) |

Following a twelfth wardship petition, J.S. admitted a felony assault with force likely to produce bodily injury.  Following a contested disposition hearing, where witnesses for both the prosecution and minor testified, the juvenile court, in a lengthy ruling from the bench, committed J.S. to the Department of Corrections and Rehabilitations, Division of Juvenile Justice (DJJ) for a maximum confinement term of seven years and six months.  J.S. asserts the court abused its discretion, claiming the court's findings—that there was a probable benefit to the minor from a commitment to DJJ and less restrictive alternatives would be inappropriate or ineffective—are not supported by substantial evidence.  We conclude otherwise and therefore affirm the DJJ commitment.  The Attorney General concedes that in light of new statutory provisions, the maximum confinement term should be reduced

1

by one year to six years and six months.  We therefore order that the commitment term be modified accordingly.

## DISCUSSION[1]

### *Applicable Law*

"The statutory scheme governing juvenile delinquency is designed to give the court 'maximum flexibility to craft suitable orders aimed at rehabilitating the particular ward before it.' [Citation.]  Flexibility is the hallmark of juvenile court law. . . ."  (*In re Greg. F.* (2012) 55 Cal.4th 393, 411.)  Accordingly, juvenile courts have "broad discretion to choose probation and/or various forms of custodial confinement in order to hold juveniles accountable for their behavior, and to protect the public."  (*In re Eddie M.* (2003) 31 Cal.4th 480, 507.)

In making its dispositional order, the juvenile court must "consider 'the broadest range of information' in determining how best to rehabilitate a minor and afford him adequate care."  (*In re Robert H.* (2002) 96 Cal.App.4th 1317, 1329.)  In addition to any other relevant and material evidence offered at the hearing (Welf. & Inst. Code, § 202, subd. (d)), the court should also consider "(1) the age of the minor, (2) the circumstances and gravity of the offense committed by the minor, and (3) the minor's previous delinquent history."  (*Id.*, § 725.5; accord, *In re Jonathan T.* (2008) 166 Cal.App.4th 474, 484-485.)

In order to commit a minor to DJJ, "there must be evidence in the record demonstrating both a probable benefit to the minor by a [DJJ] commitment and the inappropriateness or ineffectiveness of less restrictive alternatives."  (*In re Angela M.* (2003) 111 Cal.App.4th 1392, 1396; accord *In*

---

[1]  We discuss pertinent facts in connection with our discussion of the issues on appeal.

2

*re M.S.* (2009) 174 Cal.App.4th 1241, 1250 ["A [DJJ] commitment is not an abuse of discretion where the evidence demonstrates a probable benefit to the minor from the commitment and less restrictive alternatives would be ineffective or inappropriate."]; see Welf. & Inst. Code, § 734 ["No ward of the juvenile court shall be committed to the [DJJ] unless the judge of the court is fully satisfied that the mental and physical condition and qualifications of the ward are such as to render it probable that he will be benefited by the reformatory educational discipline or other treatment provided by the [DJJ]."].)

"A commitment decision is reviewed on appeal for abuse of discretion, indulging all reasonable inferences to support the juvenile court's judgment. (*In re Angela M.*[, *supra,*] 111 Cal.App.4th [at p.] 1396. . . .) 'We have no power to judge the effect or value of the evidence, to weigh the evidence, to consider the credibility of witnesses or to resolve conflicts in the evidence or the reasonable inferences which may be drawn from that evidence.' (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52–53[, disapproved on another ground in *In re Caden C.* (2021) 11 Cal.5th 614, 636, fn. 5]. . . .)" (*In re Edward C.* (2014) 223 Cal.App.4th 813, 829.)

Thus, an appellate court "will not disturb [a juvenile court's] findings when there is substantial evidence to support them." (*In re Michael D.* (1987) 188 Cal.App.3d 1392, 1395.) "In determining whether there was substantial evidence to support the commitment," the court "must examine the record presented at the dispositional hearing in light of the purposes of the Juvenile Court Law." (*Ibid.*)

### *The Court's Commitment Ruling*

The juvenile court delivered a thorough and thoughtful commitment ruling from the bench, which we quote in pertinent part:

"[THE COURT:] [T]he Court has reviewed all of the exhibits that have been presented to the Court. I have read every single probation report that was filed in [appellant's] history. There are numerous—I think I have 17 or 18 binders in my chambers which are composed of behavioral reports, probation reports, psychological assessments, medication evaluations. I mean, I have read everything.

"I have considered the testimony here today of the witnesses, specifically the testimony of Dr. McIntyre, the testimony of Michael Farmer, the testimony of Dr. Crystal Watson-Krull, the testimony of Becky Powers, the testimony of Janelle Holowat[y]. I have considered Mother's statement, [appellant's] written statement. [¶] . . . I found . . . Dr. McIntyre[,] . . . Michael Farmer[,] . . . Dr. Crystal Watson-Krull[,] . . . Becky Powers[,] . . . and . . . Janelle Holowat[y] . . . to be . . . credible witness[es].

"So the Court is aware here that the Court must be fully satisfied that the mental and physical condition and qualification of the minor are such as to make it probable that the minor will benefit from a reformatory educational discipline or other treatment provided by DJJ and the record must contain adequate evidence of programs that DJJ is expected to benefit the minor.

"There is no requirement that the Court find exactly how the minor will benefit from the commitment to DJJ. The record must show that less restrictive alternatives would be ineffective or inappropriate. . . .

"The Court is also aware that the minor is under the jurisdiction of the juvenile court. As a consequence of their delinquent conduct, shall in conformity with the interest of public safety and the protection, receive care, treatment, and guidance that is consistent with their best interest that holds them accountable for their behavior and that is appropriate for their circumstances. This guidance may include punishment that is consistent with the rehabilitative objectives.

"And, further, in making a dispositional order, the juvenile court must be guided by the rehabilitative goals of the juvenile system.

"Again, the standard here is no ward of a juvenile court shall be committed to the youth authority under [Welfare and Institutions Code section] 734 unless the judge of the court is fully satisfied that the

4

mental and physical conditions and qualifications of a ward are such as to render it probable that he will be benefitted by the reformatory educational discipline or other treatment as provided by DJJ. [¶] . . . [¶]

"A DJJ commitment is the last sanction in the scheme of rehabilitative function. It should only be used as a last resort and only in the most serious cases and only left if all else has failed. [¶] . . . [¶]

"In the case before the Court, the Court does find that the People did provide substantial evidence of a probable benefit from treatment and rehabilitative programs provided by DJJ. The evidence submitted demonstrates during the past four years the consistent goal of probation has been to maximize and provide the minor with the best available services in the least restrictive manner with the goal towards rehabilitation.

"The evidence demonstrates that minor is prone to delinquent behaviors and has had difficulty adhering to GPO rules. He has had significant supervision problems due to his noncompliant behavior. He has an extensive trauma history, an unstable living situation early on in his life, difficulties with impulsivity and emotional regulation. He was diagnosed with PTSD and a history of committing battery while at the Y[S]C, Youth Services Center. He has exhibited aggressive behavior towards staff at the Youth Services Center and, in general, some of his placement commitments although they were short because he never stayed long enough in most placements.

"There are 14 separate sustained charges and 12 petitions. Two of those sustained petitions are for felony charges. The second felony is the Penal Code section 707 offense for which he stands before the Court for disposition.

"In this manner as it relates to that charge, on May 4th of 2019, . . . [t]here was an altercation that involved several youth assaulting the other youth, who was identified as a Sureno gang member. [J.S.] was actively engaged in punching that youth with a closed fist. [Group Supervisor] Castro, the victim in this case, observed the youth that was under attack and trying to get away and observed him to try to get away from his assailant, and in doing her job to protect that youth from being assaulted, she intervened to protect him by pulling him down.

5

"As she was trying to physically intervene, she felt and saw [J.S.] punch her repeatedly striking her head and body with a closed fist. She continued to verbally identify herself as a group supervisor. She was struck at least six times in the head, back, and face with closed fists. [J.S.] struck her directly in the face causing injury to her right eye. She described [appellant] as in a rage, ignoring her orders . . . and pleas for him stop. It was only after another group supervisor intervened and physically pulled the minor off that she was able to escape the attack and remove herself from the situation. [¶] . . . [¶]

"During the past four years, probation has tried to provide services for [J.S.] with the best available services in the least restrictive manner with the goal of rehabilitation."

"[T]he evidence that was presented in this trial as it relates to the services provided by DJJ, Michael Farmer [¶] . . . [¶] described the intake process, orientation, mental health treatment program, intervention strategies, CORE programs, educational services, and re-entry strategies that are in use at DJJ. At intake, a youth is provided with intensive mental health screening, risk assessment, medical and medication evaluation. The youth's IEP and records from the receiving county would be carefully evaluated and utilized.

"He talked about the three levels of the core program, the IBTM, Integrated Behavioral Treatment Model; the reward incentive program based on group therapy and individual therapy, trauma-based treatment, anger management, and counterpoint all designed for the development of the youth's prosocial lifestyle. DJJ has teachers, psychologists, youth correctional counselors, psychiatrists, and casework specialists. [¶] There is a constant 90 to 120-day review of the minor's progress. There is family engagement activities and counseling. . . . They look at the minor's mental health issues. DJJ has an intake process for minor[s] with special needs. All the minor's previous mental health reports would be included in the intake package and considered."

"[I]n conclusion, the Court finds that there is substantial evidence in the record that demonstrates both the probable benefit to the minor by a DJJ commitment and the inappropriateness or ineffectiveness of less restrictive alternatives.

"Specific programs have been identified in great detail by the People. The juvenile hall is ill-equipped to address [J.S.'s] specific needs. The GPO's, the general placement orders, have been ill-equipped to address [J.S.'s] specific needs because he is never there long enough to take advantage of the programs because he runs and when he runs, he commits new offenses. When [J.S.] has been home on [electronic monitoring], it is not appropriate. Home is not an appropriate place to address his specific needs because of his elopement issues.

"[J.S.] will derive a probable benefit from treatment and rehabilitation programs provided by DJJ and proposed less restrictive alternatives are ineffective and inappropriate. The minor needs a secure structured and locked facility. DJJ provides such an environment. The minor deserves an opportunity for meaningful rehabilitation and a higher level of care that DJJ can provide. [¶] While, [defense counsel], I know that you say because his behavior has improved in your opinion, the Youth Services Center would be appropriate. He is not getting the services that he needs there. When [J.S.] is dysregulated, emotions take over and then there are problems, and Youth Services Center is not addressing those issues, and I am concerned about this young man's future. [¶] I want to give him opportunity to get services in place to help understand his emotions so that his emotions are not driving the bus so that he can think through his emotions so that he doesn't hurt people in the future or himself."

### *Substantial Evidence Supports the Court's Findings*

#### *Probable Benefit*

The probation department is not required "in its report and initial testimony to provide indepth information about the [DJJ's] programs," and "where the probation officer has identified programs of benefit to a minor and provided brief information about the most important programs, it may be presumed the probation officer's recommendation is based on an assessment the programs are available and appropriate." (*In re Carlos J.* (2018) 22 Cal.App.5th 1, 13.) "Where a minor has particular needs, the probation department should also include *brief* descriptions of the relevant programs to address those needs," and "[i]t will likely be acceptable for the probation

7

department to include substantially similar information about the [DJJ] in most of its reports." (*Id.* at p. 12; e.g., *In re M.S., supra,* 174 Cal.App.4th at pp. 1249, 1251 [probation officer listed numerous specific programs at the DJJ expected to be of benefit to the minor and provided additional information about the available medical services, which were of particular importance to the minor].)

Here, parole agent Michael Farmer, a DJJ court and community liaison who had worked at DJJ for 23 years, testified about the services and programs available at DJJ. Farmer explained that a minor committed to DJJ is first evaluated during an intake process. Promptly, the minor is examined by a psychologist. During the first 45 days, the minor is examined by doctors and meets with other staff to determine the specific treatment programs the minor will be offered and the minor will enroll in school or vocational training. A questionnaire is also sent to the minor's family during intake for input on the minor's needs.

Once DJJ's intake procedure is completed, the minor is transferred to a living unit based on the information provided through the intake process and the assessed risk that he or she will reoffend. The living units have on-site counselors, casework specialists, therapists, psychologists, and nursing staff.

Farmer explained that DJJ uses an "[I]ntegrated Behavior Treatment" model wherein the minor works with a treatment team that includes mental health and education staff. The entire team works together to address the individual needs of the minor. DJJ's programming is evidence-based; that is, the programs offered "have been researched and determined to be effective for specific high-risk areas."

Because of the minor's assault offense, his baseline date for release from DJJ would be two years, assuming he did not participate in any

8

program to earn time credits.  However, DJJ has an "incentive-[based] program" aimed at encouraging minors to earn an earlier parole date.  Family members are encouraged to visit on the weekends, and DJJ hosts family nights, offering family members a chance to talk to the minor's counselors.

DJJ also provides a full reentry process that essentially begins during the intake process.  The goal, Farmer explained, is "not to wait until . . . six months before their projected [parole] board date to begin thinking about what life is going to look like once they get back out or when they return to the community."

Farmer described the various behavioral and educational programs that would be available to the minor at DJJ.  These include CounterPoint, Aggression Replacement Therapy, cognitive behavioral programs, substance abuse programs, and educational programs where the minor can earn a high school diploma and participate in college and career technical courses.  In addition to education or work, typically, "[e]veryone is participating daily in the skill-of-the-week intervention, and each youth should be assigned to, at least, one primary intervention, whether it is Aggression Replacement Therapy, Substance Abuse or CounterPoint, all of the time.  Those groups meet two to three times a week, but there are also times they may not be in group.  They may be meeting individually with their youth correctional counselor discussing issues, their treatment plan, perhaps discussing journal assignments as well."

The prosecutor also presented testimony from Dr. Crystal Watson-Krull, a psychologist who had worked at DJJ for seven years and trained staff there.  Dr. Watson-Krull testified as an expert in mental health and trauma-informed treatment for youth at DJJ.  Minors with long-term history

9

of trauma "[g]enerally" "respond well" to individualized treatment at DJJ but it could take "a little longer for them to develop that trust and to feel safe enough to engage in treatment." She explained, "A good number of our youth come in and they have failed . . . out of different treatment programs, foster cares, group homes, camps. . . . [¶] So it becomes very important that we set them up to succeed once they get there because it tends to be that they developed a sense that they are unable to succeed when really sometimes things just weren't geared well towards them."

In Dr. Watson-Krull's opinion, a minor with a significant and complex history of trauma could derive a probable benefit from the programs and services available at DJJ. She explained, DJJ "provide[s] comprehensive treatment in a contained environment with a high number of pro-social adults involved and maintain[s] structure, and [staff] meet[s] [the] youth where they are and . . . provide[s] them with the treatment they are ready for."

Dr. Watson-Krull also reviewed a report prepared by defense expert Dr. David McIntyre and was of the opinion the minor profiled in the report—namely, J.S.—would derive a benefit from trauma-informed care or treatment at DJJ. "A youth with this profile needs an environment where they are not able to run away where they can end up causing harm to themselves or others, and it would be very important they were housed somewhere that they could be stabilized and be prepared for treatment."

This testimony amply supports the juvenile court's finding of a probable benefit to the minor by a DJJ commitment. (See *In re A.R.* (2018) 24 Cal.App.5th 1076, 1081 [juvenile court properly considered " 'criminogenic factors, the history presented, [and] the need for drastic measures,' " along

with the " 'well of services available,' " in concluding "DJJ would meet [minor's] rehabilitative goals"].)

The minor's experts expressed different opinions as to the benefits of a DJJ commitment. But that does not mean the juvenile court's finding of a probable benefit is not supported by substantial evidence. (See *In re N.C.* (2019) 39 Cal.App.5th 81, 87 ["our role on appeal is to determine whether the juvenile court's order is reasonably grounded in the record, not to reweigh the evidence in the record"]; *In re Alejandro G.* (2012) 205 Cal.App.4th 472, 480 [juvenile court has no obligation to adopt an expert's opinion, and the fact that multiple experts had a different opinion than the court does not prove a lack of substantial evidence to support the court's ultimate finding].) We also note that Dr. McIntyre, who testified for the minor as an expert in child psychology and adolescent development, agreed on cross-examination that the minor would benefit from a secured, structured, and locked facility to prevent him from absconding and would derive a probable benefit from the evidence-based cognitive behavioral therapy programs at DJJ. He also agreed DJJ would likely be a "good treatment model" for the minor, voicing a concern about "[h]ow it is executed" but without further elaboration.

### *Least Restrictive Placement*

The minor was placed in numerous less restrictive settings—at home, at home with electronic monitoring, at home with specialized programs (including the Family Preservation Program (FPP) and Wraparound Services Program (WSP)), at Aaron's Boys Home, at Koinonia Home for Teens, at Rites of Passage, and at Courage to Change. He also served multiple short-term detentions at the Youth Services Center (YSC).

He was not successful in any of these settings. He repeatedly removed electronic monitoring devices. Less than two weeks after he was placed at

11

Aaron's Boys Home, he was terminated from the program for twice leaving without permission and for engaging in criminal activity. He was similarly terminated from the Koinonia Home two weeks after placement, again for leaving without permission and engaging in criminal activity. He was removed from Rite of Passage because it could not provide him with appropriate services. A month after he was placed at Courage to Change, from which he also briefly absconded, he was terminated for refusing to follow program rules and threatening staff and other residents.

The minor's unsuccessful placement history, alone, supports the juvenile court's finding that a less restrictive placement would be inappropriate or ineffective. (See *In re A.R., supra,* 24 Cal.App.5th at p. 1082 [where minor "repeatedly failed to succeed at other less restrictive placements and change was needed imminently," juvenile court could reasonably conclude that, notwithstanding the probation department's recommendation, that a less restrictive placement would be inappropriate and ineffective]; *In re Jonathan T., supra,* 166 Cal.App.4th at p. 486 ["it is not merely the programs at DJJ which provide a benefit to minor, but the secure setting as well"].) Moreover, the need for a significant change from prior placements "is amplified by" the minor's age; "at 18, there is little time remaining before he faces the adult correctional system." (*In re A.R.,* at p. 1082.)

In addition, Dr. Watson-Krull testified that a youth with a profile like that of the minor "needs an environment where they are not able to run away where they can end up causing harm to themselves or others, and it would be very important they were housed somewhere that they could be stabilized and be prepared for treatment." The defense's expert in child psychology and adolescent development, Dr. McIntyre, also agreed on cross-examination that

the minor would benefit from a secure, structured, and locked facility to prevent him from absconding.

Again, the minor's experts disagreed. But, again, a disagreement among the experts does not mean the court's finding is not supported by substantial evidence. (See *In re N.C., supra,* 39 Cal.App.5th at pp. 87–88; *In re Alejandro G., supra,* 205 Cal.App.4th at p. 480.)

The minor maintains his lack of success in prior less restrictive placements should be of little consequence because in none of those placements did he receive the full panoply of therapeutic services he needs, particularly for his more recently diagnosed mental health challenges. Even if this were true, what the minor's argument discounts is the need to ensure that he *remains* at a facility that can provide these services. And on this record, the juvenile court was on solid ground in concluding that there was a very real risk the minor would not remain in a less restrictive program long enough to benefit from the array of services he needs. (See *In re A.R., supra,* 24 Cal.App.5th at p. 1081 [juvenile court "had already tried a series of less restrictive settings"]; *In re Jonathan T., supra,* 166 Cal.App.4th at pp. 484-486 [DJJ commitment appropriate where minor had history of running away and aggressive behavior at juvenile hall].)

### *Term of Confinement*

The Attorney General agrees the minor is entitled to the ameliorative benefit of amended Welfare and Institutions Code sections 730, subdivision (a)(2) and 731, subdivision (c).[2] He further agrees that in accordance

---

2  Senate Bill No. 823 (2019-2020 Reg. Sess.) (SB 823) amended Welfare and Institutions Code section 731, subdivision (c) to provide, "The court shall not commit a ward to the Division of Juvenile Justice for a period that exceeds the middle term of imprisonment that could be imposed upon an adult convicted of the same offense." (Welf. & Inst. Code, § 731, subd. (c);

therewith, the minor's maximum term of confinement at DJJ should be reduced to six years six months.  We agree with the parties sentencing analysis and order minor's maximum term of confinement at DJJ reduced to six years six months.

## DISPOSITION

The juvenile court's order committing J.S. to DJJ is affirmed, except as to the maximum confinement time, which is reduced to six years and six months.

---

Stats. 2020, ch. 337, §§ 28, 53.)  Welfare and Institutions Code section 731, subdivision (c) became inoperative on July 1, 2021, and is repealed as of January 1, 2022.  (Welf. & Inst. Code, §731, subd. (d).)

SB 823 applies the same limitation on the maximum confinement period to all juvenile commitments as of July 1, 2021, by amending Welfare and Institutions Code section 730, subdivision (a)(2) to provide, "A court shall not commit a juvenile to any juvenile facility for a period that exceeds the middle term of imprisonment that could be imposed upon an adult convicted of the same offense."  (Stats. 2020, ch. 337, § 27.)  This amendment thus becomes operative on the date section 731, subdivision (c) becomes inoperative, and since it applies to "any juvenile facility," it likewise covers DJJ commitments.

_____
Banke, J.

We concur:

_____
Margulies, Acting P.J.

_____
Sanchez, J.

A161062, In re J.S

15