Filed 11/17/21  In re Christopher K. CA1/4

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION FOUR

| | |
|---|---|
| In re CHRISTOPHER K., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CHRISTOPHER K.,<br><br>    Defendant and Appellant. | A161890<br><br>(Contra Costa County<br>Super. Ct. No. J1900553) |

Believing his family and friends were trying to kill him, minor Christopher K., then 16 years old, repeatedly stabbed his younger brother's friend with a hunting knife. Christopher appeals from the juvenile court's disposition findings and order issued in a wardship proceedings initiated pursuant to Welfare and Institutions Code[1] section 602, committing him to the Department of Corrections and Rehabilitation, Division of Juvenile Justice (DJJ). Christopher contends his DJJ commitment was an abuse of

---

[1] All statutory references at to the Welfare and Institutions Code unless otherwise stated.

1

discretion because there was no substantial evidence that a less restrictive alternative, specifically the Youthful Offenders Treatment Program (YOTP) at juvenile hall, would be ineffective or inappropriate. We disagree and affirm.

## PROCEDURAL AND FACTUAL BACKGROUND

### I.

On June 3, 2019, a juvenile wardship petition was filed pursuant to section 602, alleging Christopher came within the juvenile law as a result of his committing attempted murder (Pen. Code, §§ 187, 664). In addition, the petition alleged Christopher caused great bodily injury (Pen. Code, § 12022.7, subd. (a)), and used a dangerous or deadly weapon, a knife, in the commission of this offense (Pen. Code, § 12022, subd. (b)(1)).

On June 6, 2019, the court declared a doubt as to Christopher's competency, suspended proceedings, and ordered an evaluation. (§ 709, subd. (b).) On June 28, 2019, after receiving the evaluation, the court found Christopher incompetent (§ 709). On June 15, 2020, after receiving a new examination report, the court found Christopher to be competent.

On July 8, 2020, the original petition was amended to additionally allege assault by means likely to cause great bodily injury (Pen. Code, § 245, subd. (a)(4) (count 2)) against the same victim on the same date. The amended petition also alleged Christopher caused great bodily injury (Pen. Code, § 12022.7, subd. (a)), and used a dangerous or deadly weapon, a knife, (Pen. Code, § 12022, subd. (b)(1)) during this offense.

On July 13, 2020, at arraignment on the new petition, Christopher agreed to plead no contest to the aggravated assault (count 2) and enhancements, in exchange for the dismissal of the attempted murder charge (count 1). The parties agreed Christopher could move for dismissal (§ 782) on

his 21st birthday, and the People would consider dismissing the "strike enhancement." Christopher waived his right to appeal the jurisdiction finding.

On December 14, 2020, following a multi-day, contested disposition hearing, the juvenile court adjudged Christopher an indefinite ward of the court, ordered that his welfare required that he be removed from parental custody, and ordered him committed to DJJ for a maximum term of six years.

## II.

### A.     The Offense[2]

On May 30, 2019, just after his 16th birthday, Christopher repeatedly stabbed 14-year-old Daniel with a hunting knife. Daniel, who was a friend of Christopher's younger brother, Joseph, had come over to hang out with Joseph. Soon after Daniel arrived, Christopher seemed annoyed and wanted to know when Daniel was going to leave. Just prior to the stabbing, all three boys had been smoking marijuana together on the couch, when Christopher stood up and started acting "weird." Christopher leaned on a counter and stared angrily at Daniel. When Daniel started gathering his things, Christopher grabbed a knife and stabbed him multiple times, stopping only after Daniel fell off the couch and onto the floor. Christopher fled the apartment with the knife, and Joseph called the police.

When the police arrived, Daniel was lying on his back. His clothes were bloodied, and he was pale and sweaty. An officer cut away Daniel's shirt and found three stab wounds on the back of Daniel's upper arm, and five to six stab wounds on Daniel's right mid-torso and upper right shoulder blade.

---

[2] The facts are taken from the June 22, 2020 probation report, which is based on the police report.

3

After the officer bandaged the wounds and applied pressure, Daniel was taken to the hospital.

Meanwhile, Christopher, who had fled to a nearby Dairy Queen, called 911. Christopher told responding officers that he ran because he was "scared." Later, at the police station, after receiving his *Miranda*[3] rights, Christopher told the interviewing officer that his family members had been acting very suspiciously. He acknowledged it could be paranoia, but he believed his family was trying to kill him. Christopher rambled about "hella strange shit happening around this neighborhood" and "people following him." He said that his brother and brother's friend were at the apartment that afternoon " 'being weird,' " but Christopher could not explain why he found their behavior weird. He admitted stabbing the victim with a hunting knife that belonged to his father. Christopher said he stabbed the victim because he thought he was going to be killed, but he could not elaborate on his reasons for this belief.

## B. The Probation Reports

### 1. *July 22, 2020*

On July 22, 2020, the probation department filed a report and recommendation to the juvenile court, recommending the court order indefinite wardship for Christopher with a commitment to DJJ. The department reported that, although this was his first arrest and first referral, Christopher had committed an extreme act of unprovoked violence and had exhibited "excessive behavioral issues" while in custody. Christopher punched walls, banged doors, yelled profanities, and threw objects. There were multiple reports of Christopher threatening to kill staff members and their families. There were also reports of physical violence. On December 9, 2019,

---

[3] *Miranda v. Arizona* (1966) 384 U.S. 436.

Christopher bloodied another youth, striking him repeatedly with closed fists despite the other youth not fighting back. On January 10, 2020, Christopher punched a staff member who was attempting to guide him back to his room. On March 18, 2020, Christopher choked another youth during a basketball game. On two occasions during June 2020, staff found improvised "shanks" under Christopher's pillow.

The probation report also detailed Christopher's extensive substance abuse. Christopher first tried marijuana during sixth grade, and alcohol during seventh grade. Christopher stole money from his father to buy marijuana; he stole alcohol from stores. When Christopher was drinking, he would usually drink an entire bottle of vodka. Christopher said he smoked marijuana daily and regularly used "methamphetamine, acid, LSD, Klonopin, Oxycodone, Xanax, and lean (a prescription-strength cough syrup)." Christopher said he had taken Klonopin and "vaped THC" on the day of the offense. He described himself as an addict and acknowledged he needed treatment for substance abuse.

The probation department expressed concerns about the possibility of Christopher having "unregulated mental health issues that have not been addressed." The report explained that Christopher's mother, who was diagnosed with bipolar disorder, abandoned the family when Christopher was very young, which traumatized him, as did the fact that he was badly bullied in school. Christopher admitted he felt "extreme bouts of happiness and anger." Christopher's father reported that Christopher "would regularly assault his younger brother, even when his brother was too young to properly defend himself."

The probation department found Christopher unsuitable for YOTP. Citing "the unprovoked violence of the instant offense, the injuries incurred

5

by the victim, the serious substance abuse issues and the continued violence exhibited by this youth while in custody," the report concluded Christopher was "not acceptable for the YOTP." The report stated: "It is probable to conclude the minor will have access to objects in which he can mold into weapons, in an attempt to alleviate his anxious thoughts about the need to defend himself from other residents."

If committed to DJJ, in the first 30 days Christopher would receive a mental health evaluation and a diagnostic assessment by a psychologist, including an intelligence test, psychosis screening, and substance abuse screening. Christopher could also "be referred for a full psychological evaluation, a psychiatric review for medication, or screening for placement in a specialized unit."

### 2. November 5, 2020

In an addendum report dated November 5, 2020, the probation department noted that while the contested disposition hearings were ongoing, the juvenile court, on October 14, 2020, had granted Christopher's request to be housed in YOTP, pending the outcome of the disposition. However, soon after the YOTP placement, on or about October 22, Christopher stopped taking his medication and then exhibited signs of increased paranoia and anxiety. Christopher was removed from YOTP on October 28, when a third manufactured weapon was discovered inside his mattress. The object, made from two toothbrushes "tied together with plastic and string" was five- to-six inches long and sharpened on both sides.

## C. Contested Disposition Hearing

The juvenile court held an eight-day contested dispositional hearing in 2020.

## 1. *Prosecution Case*

*Juvenile Institution Officer Pope*

Juvenile institution Officer Bradley Pope testified that on June 7, 2020, under Christopher's pillow he found the broken handle of a plastic spoon, wrapped with "some kind of threaded material." It had a "point" and "looked like it could have been used for a stabbing weapon or stabbing device," and thus potentially capable of injuring someone. On June 22, 2020, again under the pillow, he found the sharpened, handle of an "orange spork" and two shortened sharpened pencils wrapped with thread. This item appeared to be sharp enough to injure someone, and a more sophisticated "stabbing weapon" than the item found on June 7. Christopher admitted he "was wrong in making" the item and he agreed not to make any more items like it.

Officer Pope testified that Christopher had attacked other youths at juvenile hall on multiple occasions.

*Probation Department Supervisor Faulkner*

Kira Faulkner, a supervisor in the Contra Costa County Probation Department, testified that Christopher was not suitable for placement at YOTP. Prior to her current position, Faulkner had supervised YOTP supervisors and screened youth for suitability to YOTP. In light of the circumstances of Christopher's offense and his social history, Faulkner opined Christopher would not be a good fit for YOTP because his "serious mental health issues" required more treatment than YOTP could offer. She explained that YOTP was typically a nine- to 12- month program (or "longer based on behavior"). YOTP consisted of three 90-day institutional phases, and a six-month aftercare period.

In her view the YOTP mental health resources were "not to the level" Christopher needed. YOTP had only a part-time psychiatrist, no 24/7 mental

health on-call response, and only three licensed therapist clinicians. Faulkner testified that YOTP was for delinquent youth who needed to learn how to think differently about their choices, not for those with long-term mental health issues. YOTP services did not do full psychological evaluations of wards and were more akin to "triage" than they were to outpatient or residential programs. She cited the lack of group therapy at YOTP, which she testified was "usually a key component in overall treatment."

Based on Faulkner's review of DJJ materials, she opined Christopher would receive a more thorough psychological evaluation at DJJ than he would at YOTP. Christopher would receive extensive therapy and have access to more "thoughtful therapeutic treatment" at DJJ, including group therapy. As DJJ employed a full-time psychiatrist, a couple of clinical psychologists, and "maybe up to 10" others, Christopher would have a larger mental health team working for him than he would at YOTP.

Faulkner also believed that YOTP was inappropriate because of concerns for community safety, specifically concerns for the victim and protecting him. Faulkner was concerned about the risk Christopher "might pose to the community if there were no interventions that were in place prior to his release back to his home." The "length of programming" at DJJ would keep Christopher away from his victim and the community for a longer period and would permit Christopher the time to obtain the services he needed.

Faulkner, who was not trained in treating mental illness, admitted she had not spoken to the mental health staff at juvenile hall about Christopher's case, and had no knowledge about his diagnosis.

*Parole Agent Custino*

Lorraine Custino, a parole agent and the community and court liaison for DJJ, screened cases for DJJ eligibility. Custino explained that DJJ had a 45-day initial clinic process, which included screening, by one of three psychologists, for medical, psychological, mental health, and educational issues. After the screening and assessments, the ward was assigned to an appropriate living unit. If a ward had previously noted mental health issues, the associate director of mental health services decided whether to send the youth to a mental health residential unit, the intensive behavior treatment program, or outpatient services with a regular reviewing unit. Upon the ward's arrival at DJJ, a psychologist decided whether to bypass the intake program and to send the youth directly to the mental health unit.

The DJJ mental health unit, with a maximum population of 24, treated wards with significant diagnoses who were on psychotropic medications and needed a smaller living unit. The assigned psychologist was available 24 hours, 7 days a week. A psychologist met with the ward at least weekly and more often if needed.

The DJJ intensive behavioral treatment program was similar to the mental health residential unit, but addressed youth with unstabilized aggression and violence issues. The program had a maximum population of 16 (but usually only 10), a school and "one-and-a-half psychologists." The wards met with a psychologist at least weekly. Both the mental health residential unit and the intensive behavior treatment program offered a 30-week substance abuse cognitive-behavioral based program, "aggression interruption training," and other cognitive-behavioral based programs.

DJJ psychiatrists tracked and prescribed medications, which wards could refuse, but, where that posed a safety issue, DJJ could "get emergency medications delivered to the youth." A ward's refusal of medication did not prevent continued therapy and programming. DJJ's safety procedures, including daily room and metal-detector searches, ensured that youth did not possess weapons.

### 2. Defense Case

*Dr. Andrew Pojman*

Dr. Andrew Pojman, a clinical psychologist and an expert in the field of adolescent psychology, opined that YOTP was an appropriate placement for Christopher. Dr. Pojman spent about five hours with Christopher, three hours over video conference and about two hours in person. He reviewed Christopher's family, medical and developmental history and his juvenile hall record. Dr. Pojman's testing reflected that Christopher had average intellectual ability, which was influenced by his impulsivity, emotionality, low frustration tolerance, and nascent abstract thinking ability. Christopher was also cognitively immature, and had "a number of neurodevelopmental weaknesses in executive functioning, specifically his inhibition, poor memory, [and] bad planning ability." Christopher had difficulty controlling his feelings, which overwhelmed him and increased his paranoia.

Dr. Pojman diagnosed Christopher with bipolar disorder with psychotic features—more specifically—a mood disorder, that "made it more difficult" for him than for other people to control his mood. "And as part of that mood disorder," Dr. Pojman continued, "there's impulsivity, moodiness. There can be hyperaggression, overactivity, a lot of different things." Dr. Pojman concluded that Christopher also had anxiety and depression. Dr. Pojman testified that an "integration of test data" suggested Christopher was a

10

psychologically traumatized youth who was "impulsive, dramatic, unruly, and paranoid."

In Dr. Pojman's opinion, upon arriving at juvenile hall, Christopher was psychotic, with an underlying "psychotic process," which included Christopher's severe paranoia, inability to control his feelings, and a history of severe aggression. Christopher's paranoia that people "were out to get him" and "kill" him "trumped everything" else. Dr. Pojman described Christopher's severe substance abuse history as a coping mechanism for his anger, abandonment, and depression. While his substance abuse may have contributed to Christopher's offense, Dr. Pojman did not believe it was a significant factor, given his paranoia. He concluded that Christopher's brain chemistry, immaturity, and personality made it impossible for him to control himself and that medication would be "critically helpful" to address that.

Dr. Pojman opined that, with appropriate medication, the YOTP mental health treatment ("cognitive behavior therapy," "anger risk training," and "substance abuse training") would be adequate to address Christopher's needs. He expected a significant decrease in Christopher's aggression given that at the end of July 2020, Christopher began receiving proper medication, opining "he's not going to be as aggressive, . . . he's going to be under more control." However, without treatment and without medication, Christopher would be at a high risk to commit another violent offense.

*Dr. Daniel Batiuchok*

Dr. Daniel Batiuchok was the program manager for Contra Costa County Juvenile Mental Health and Probation Services. Juvenile hall did not have a mental health unit, but provided mental health screenings, clinical and risk assessments, crisis interventions, short-term therapy, and longer-term therapy. Short-term therapy, which focused on specific skills or

11

techniques, was available for up to 12 weeks. Longer-term therapy was "open-ended and sometimes more insight focused." Both therapies included one-on-one meetings, depending on the needs of the ward.

It was "not uncommon" for the mental health team at juvenile hall to treat "mood disorders, depression-related disorders, anxiety disorders, trauma-related disorders, post-traumatic stress disorder, . . . attention deficit hyperactivity disorder, behavioral disorders, oppositional defiant disorder, [and] conduct disorder." The team occasionally treated pronounced psychiatric or psychotic disorders, and had the flexibility to provide intensive mental health services when needed.

Group therapy was not available at juvenile hall. Nor did the mental health team provide substance abuse treatment. However, probation staff at YOTP were certified and did teach a cognitive behavioral substance abuse class. Juvenile hall did not provide emergency medication for wards, but employed a psychiatrist, about 12 hours a week, who prescribed and managed the wards' psychotropic medication. Other than Dr. Batiuchok, whose role was mostly administrative, juvenile hall had only two full-time licensed marriage and family therapists.

At YOTP, each youth was assigned a mental health clinician, but they were not available 24/7, and juvenile hall did not provide 24/7 mental health services. Dr. Batiuchok testified, "If a mental health issue were to emerge that was a severe safety concern, then the youth could be transported to psych emergency services at county hospital."

Dr. Batiuchok admitted it was fair to describe the mental health services offered at juvenile hall as equivalent to outpatient services. Dr. Batiuchok acknowledged that in the year Christopher had been in juvenile hall, he had been medication-compliant for only two to three months.

**D. The Juvenile Court's Disposition Ruling**

The juvenile court adjudged Christopher a ward of the court and committed him to DJJ. In reaching this decision, the court considered the probation reports, as well as the testimony and the exhibits admitted in the lengthy disposition hearing. We extensively quote the juvenile court's thoughtful and detailed ruling below:

"I have considered the age of the minor, the circumstances and gravity of the offense committed by the minor, and the minor's lack of previous delinquency history. [¶] . . . [¶] I do find by clear and convincing evidence that continued custody by Christopher's parents would be detrimental to the minor and that the welfare of the minor requires that custody be taken from the parent or guardian pursuant to Welfare and Institutions Code Section 726(a)(3).

"The bottom line is, I am going to adopt the recommendation from the July 22nd report prepared by Probation and commit Christopher to the Department of Juvenile Justice. [¶] I am persuaded by the testimony of Ms. Faulkner and Ms. Custino and Dr. Batachuck [*sic*]. And I find that Christopher's needs can be more effectively addressed at the Department of Juvenile Justice than they can be at Juvenile Hall and the YOTP program. [¶] I find that the duration and intensity of mental health services that DJJ can offer are far superior to those at Juvenile Hall. Not that Juvenile Hall's are inadequate for its purpose, but it is not designed for long-term mental health treatment and therefore does not have, for example, 24-hour staffing or the depth and level of staffing that the Department of Juvenile Justice has. And the Department of Juvenile Justice is fully capable of providing for Christopher's medication needs as well.

"As I mentioned, YOTP is simply not designed or equipped to provide this level of sustained and comprehensive mental health treatment for such a serious mental illness as Christopher suffers from, and I do think the DJJ is capable of doing so. [¶] Secondly, I'm mindful of the safety of the public and, more specifically, of the youth at Juvenile Hall and of Christopher himself. I don't think that Juvenile Hall can adequately protect Christopher and the other minors at the Hall from the effects of Christopher's behavior. [¶] Christopher has manufactured three stabbing instruments while in Juvenile Hall and the third was while he was in the YOTP program briefly, at his own request. And he has also engaged in several other altercations with other members of Juvenile Hall.

"Now, I recognize that Christopher has said that these are intended for self-defense. But the problem is that his mental health illness did lead him to believe falsely that he must attack the victim in this case to prevent from being attacked by the victim. So he stabbed somebody completely innocent under the delusion that that person posed a risk to Christopher, that of course being the commitment offense. [¶] There is nothing to say that won't happen in Juvenile Hall with his manufactured stabbing weapons. If his mental illness causes him to believe that another youth at Juvenile Hall poses a risk to him, there's no reason to believe he will behave differently. [¶] Until Christopher gets the long-term and comprehensive mental health treatment that DJJ can provide, I think he poses a very significant danger to himself and others.

"As I hope is evident, I very seriously considered the YOTP program. That is why I ordered that he be placed in YOTP pending my decision, over opposition of the People and Probation. I did that because it was a serious consideration for me and I didn't want the time to be wasted in the interim.

14

[¶] But, unfortunately, Christopher's conduct in YOTP demonstrates, quite vividly, that they cannot offer him the level of mental health services and security that he needs, so I do find that DJJ is the least restrictive alternative that can appropriately address Christopher's rehabilitative and psychological needs.

"So I have considered all of the potential less restrictive programs and forms of custody, and I am fully satisfied that they are not appropriate dispositions at this time and that the minor can better benefit from the various programs provided by DJJ. . . .[¶] I do think they can provide the mental health treatment that Christopher specifically needs. They have trauma-based focused cognitive behavioral treatment, outpatient residential and inpatient programming that can be tailored to Christopher's particular needs. [¶] . . . [¶] . . . I do find that the mental and psychological conditions and qualifications of the minor are such as to render it probable that he will benefit by the reformatory educational, discipline, or other treatment provided by the Department of Juvenile Justice, particularly their mental health treatment."

E.      **Post-disposition Probation Report**

In a report dated December 29, 2020, the probation department described how Christopher became "angry and violent" at the December 14, 2020 Zoom disposition hearing, when he heard he would be committed to DJJ. While the court was rendering its decision, Christopher punched and knocked down the camera in the courtroom. As Christopher walked toward the exit, juvenile hall staff attempted to restrain him. Christopher violently resisted two juvenile hall officers, kicking, shoving, and punching them, before they were able to handcuff him.

The next day, December 15, an officer found the handle of a plastic spoon in Christopher's mattress at juvenile hall. Christopher admitted bringing the handle into his room to sharpen it into a stabbing weapon. He told staff he had "a burning desire" to make a shank. Christopher thought other youths and staff were trying to kill him and he said he would " 'take someone down with him.' "

## DISCUSSION

On appeal, Christopher challenges his commitment to DJJ as an abuse of discretion. Christopher argues the evidence was insufficient to prove that less restrictive alternatives, specifically YOTP, would be ineffective or inappropriate in his case. The record clearly belies his claims.

### A. *Standard of Review*

Minors under the juvenile court's jurisdiction must receive "care, treatment, and guidance consistent with their best interest and the best interest of the public." (§ 202, subd. (b).) "A juvenile court's commitment order may be reversed on appeal only upon a showing the court abused its discretion." (*In re Robert H.* (2002) 96 Cal.App.4th 1317, 1329–1330.) We will not lightly substitute our judgment for that of the juvenile court. Rather, we must indulge all reasonable inferences in favor of the decision and affirm the decision if it is supported by substantial evidence. (*Id.* at p. 1330.) The juvenile court's commitment decision does not constitute an abuse of discretion where the evidence "demonstrate[s] probable benefit to the minor from commitment . . . and that less restrictive alternatives would be ineffective or inappropriate." (*In re George M.* (1993) 14 Cal.App.4th 376, 379.)

***B.***     ***The Juvenile Court Did Not Abuse Its Discretion***

The record demonstrates that the juvenile court considered a less restrictive placement, specifically YOTP, and did not abuse its discretion in rejecting it as ineffective or inappropriate.

The probation report, on which the court relied, recommended DJJ as a more appropriate placement than YOTP due to the "unprovoked violence" of the offense, as well as Christopher's "serious substance abuse issues and continued violence . . . while in custody." The probation report further noted that DJJ would be able to provide Christopher with intensive counseling and therapy. The court heard extensive expert testimony recommending different placement proposals. As DJJ liaison Custino testified, DJJ had a special mental health residential unit for wards with severe mental health issues. Additionally, DJJ had an intensive behavioral treatment program for mentally ill wards who were aggressive and violent. There was evidence in the record that DJJ programs would provide Christopher with extensive, long-term behavioral and substance abuse counseling in a highly structured, disciplined, and closely supervised environment that would be beneficial to him. Further, DJJ had safety procedures in place to ensure wards did not possess weapons.

It can reasonably be inferred from the record that a less secure facility would have been an inappropriate placement for Christopher. The court was mindful of public safety, specifically for the youth at juvenile hall and for Christopher himself. As the court observed, Christopher had "manufactured three stabbing instruments while in Juvenile Hall and the third was while he was in the YOTP program . . . ." The record was also replete with instances in which Christopher engaged in violent altercations with staff and other youth while in juvenile hall.

17

Christopher, however, counters that there was no evidence he was a danger to anyone while he was taking his medication or that he would not comply with a court order requiring him to take his medication. These arguments ignore that Christopher had, in fact, refused his medication while in YOTP and that juvenile hall staff noted that he became anxious and paranoid when unmedicated. Even Christopher's expert, Dr. Batiuchok, admitted that Christopher had been medication-compliant for only a fraction of his time at juvenile hall—approximately just two to three months in the preceding year. Based on his past refusals to take his medication and his dangerousness when unmedicated, the juvenile court could reasonably lack confidence that Christopher would consistently take his medication whether on his own accord or by court order.

The court reasonably concluded that Christopher's behavior in juvenile hall, including numerous instances of unprovoked violence against staff and other youth, together with his brief stint in YOTP did not bode well for his success in a less restrictive placement. All of this evidence provided sufficient support for the court's determination that Christopher would benefit from a DJJ commitment.

Christopher does not directly challenge this conclusion. Rather, he argues that the juvenile court's rejection of YOTP was unreasonable "because there was no substantial evidence that DJJ provided essential mental health services that YOTP did not. For every program the court cited in its disposition, YOTP provided a similar program. In no instance was there substantial evidence the DJJ program was different in some essential characteristic." However, probation supervisor Faulkner testified that while YOTP had mental health services, those services were "not to the level" Christopher needed. She explained that YOTP was not designed for youth

18

with long-term mental health issues. Rather, YOTP was for delinquent youth who needed to learn how to think differently and make better choices. YOTP also lacked group therapy, which Faulkner opined was "usually a key component in overall treatment."

Christopher notes that Faulkner had not consulted any mental health staff at juvenile hall about his case. He argues that without any knowledge of his diagnosis, "there is simply no way" Faulkner could know what treatment he required and whether YOTP could provide it. In contrast, his two medical experts were familiar with his diagnosis and both opined that the mental health services at YOTP were adequate to treat his mental illness.

But the court's thoughtfully articulated decision was not limited to Faulkner's opinion. While the witnesses provided different views about the placement for Christopher, they agreed on the seriousness of his mental illness and the need for medication and long-term treatment. The court seriously considered YOTP and ordered an interim placement, but while there Christopher refused medication and engaged in violent conduct. The court concluded that because juvenile hall is not designed for long-term mental health treatment and lacks 24-hour staffing, it could not provide the treatment Christopher required.

That there was conflicting evidence as to Christopher's placement, does not warrant reversal of the juvenile court's commitment order. As stated above, our role on appeal is to determine whether the juvenile court's order is reasonably grounded in the record, not to reweigh the evidence in the record. (See *In re Alejandro G.* (2012) 205 Cal.App.4th 472, 480 [juvenile court has no obligation to adopt an expert's opinion, and the fact that multiple experts had a different opinion than the court does not prove a lack of substantial evidence to support the court's ultimate finding].) We also accept the juvenile

court's credibility determinations for purposes of appeal, and, here, the court was persuaded by the testimony of Faulkner and Custino that Christopher's needs could not be effectively addressed at YOTP and that DJJ placement was required. We decline to substitute our judgment for the juvenile court's on this issue. (See *In re Juan G.* (2003) 112 Cal.App.4th 1, 6 ["The function of an appellate court is not to reweigh the evidence and substitute its judgment for that of the juvenile court."].)

Even if the record reasonably justified an alternative placement, we will not find an abuse of discretion if there is substantial evidence of a "probable benefit to the minor from commitment . . . and that less restrictive alternatives would be ineffective or inappropriate." (*In re George M., supra*, 14 Cal.App.4th at p. 379; see *In re Reynaldo R.* (1978) 86 Cal.App.3d 250, 256 [DJJ commitment was not an abuse of discretion despite the fact that the minor's record justified less restrictive disposition].) As we explained *ante*, there was sufficient evidence in the record to support the minor's commitment to DJJ and not YOTP.

In view of the totality of the evidence in the record, the juvenile court reasonably concluded that the minor's best chance at rehabilitation was DJJ. Such a restrictive environment was necessary both to ensure Christopher's participation in a rehabilitative treatment program and to address the court's well-founded public safety concerns.

## DISPOSITION

The disposition findings and order appealed from are affirmed.

_____

Ross, J.*

WE CONCUR:


_____

Pollak, P.J.


_____

Streeter, J.


*A161890  In re Christopher K.*

_____

\* Judge of the San Francisco Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

21